891 So.2d 1260 (2005)
STATE of Louisiana
v.
Deonta GRAY and Jonta Gray.
No. 2004-KK-1197.
Supreme Court of Louisiana.
January 19, 2005.
*1261 Charles C. Foti, Jr., Attorney General, Eddie J. Jordan, Jr., District Attorney, Battle Bell, IV, Assistant District Attorney, for applicant.
Jeffrey Louis Smith, New Orleans, Dwight Michael Doskey, for respondent.
VICTORY, J.
We granted this writ application to determine whether the trial court erred in denying defendant's motion to suppress a statement made to a clergyman under Louisiana's clergyman privilege. After reviewing the record and the applicable law, we reverse the judgement of the court of appeal and hold that the trial court correctly ruled that the statement was not privileged under the clergyman privilege.

FACTS AND PROCEDURAL HISTORY
Deonta and Jonta Gray are cousins charged by Bill of Information with the attempted second-degree murder of Kayon Brumfield, a taxi cab driver, in violation of La. R.S. 14:27, 14:30.1. Before they were arrested and charged, Keyanta Gray, who is Deonta's aunt and Jonta's mother,[1] arranged for them to meet with her minister, Reverend Jeffrey Woolridge, at a motel room at the Colonial Inn in Amite, Louisiana. Reverend Woolridge was the director of the Men's Discipleship Program at the All Nations Ministry in Amite. Keyanta asked Woolridge to meet with Deonta and Jonta "to talk to her boys about a matter and lead them to Christ." At the meeting, in which both Keyanta and Jonta were present, Keyanta told the cousins to tell "Brother Jeff" what happened and Deonta related to him that "they were getting high, called a cab driver to rob him, he came, he reached for a gun, and he shot him." Woolridge requested no details and none were provided. Instead, he spoke to them "about the life that they were living and the game and the lifestyle that they were living, what it had finally brought them to and to get them to recognize that this way of life, this is what the outcome was."
*1262 After being told of the shooting, Woolridge, in the presence of Deonta and Jonta, and Keyanta, called his superior at the church, Pastor Eldolinus Sniff, for advice on what to do in response to hearing this information. Pastor Sniff then spoke to Keyanta, who became very emotional upon hearing what he had to say, and then instructed Woolridge to notify the authorities after leaving the Grays. Neither Deonta nor Jonta spoke to Woolridge's superior. Before leaving, Woolridge prayed with the Grays and he later testified that Deonta seemed to be seriously interested in changing his life. Several days after calling the police as instructed, Woolridge was contacted by a New Orleans Police Department detective to whom he voluntarily gave a statement, relating what Deonta had told him.
Deonta filed a motion to suppress the statement, arguing that his statements to Woolridge were privileged under La.Code Evid. art. 511. At the motion to suppress, Woolridge testified he had been a full-time minister for one and one-half years, that he took care of day-to-day matters at the church, set the agenda for each day and taught classes in the morning and at night. He testified that he became a minister through bible training and answering the call of God. He had never met Deonta or Jonta before this meeting, but Keyanta was a member of his church involved in women's programs. When he was called by Keyanta, he had no idea what the conversation would entail and he did not recall any mention of confidentiality. He testified that although he had counseled people numerous times, he had never been told something of this magnitude, and he conceded that he did not know what to do in this situation. He further testified that during the phone conversation, Pastor Sniff told him that he had told Keyanta to turn the boys in and that after the phone conversation, he also advised Keyanta to turn the boys in because she wanted them to be saved. However, he did not tell any of them that he intended to call the police. Finally, he testified that he was in the motel room about thirty minutes and that during that time no one else entered or called the room. He testified that he had gone to the hotel as a spiritual advisor and conceded that Keyanta never gave him any indication that she intended to leave the motel room and turn over the defendants.
After the hearing, the trial judge granted the defendant's motion to suppress Woolridge's statement to police, finding that, although there were two other persons present when Deonta confessed to Woolridge, the court was "not convinced that the presence of either the mother or the brother in any way diminished the sanctity or the applicability of the privilege within the facts of this particular case." The court of appeal reversed the trial court and remanded the case. State v. Gray, 03-0779 (La.App. 4 Cir. 6/5/03).
On remand, Deonta testified at the reopened hearing on the motion to suppress and stated that he went with his Aunt Keyanta and Jonta "to speak with a priest and for spiritual guidance." He testified that he had never spoken to a priest or minister before that day, that he did not attend that, or any other, church, and that he did not personally know Woolridge. He testified that he had never heard of the clergyman privilege, but that he did not expect the minister to tell the police and thought his conversation would be kept confidential. He admitted that Woolridge made a phone call from the motel room, but claimed that he did not know who was on the other end of the phone, that he did not listen to the conversation, and that he did not inquire as to whom the minister was calling. When asked if he asked the minister if he was going to speak to someone else about what was said there, Deonta answered: "No, sir. I though I shouldn't have to."
*1263 After considering Deonta's testimony, the trial court denied the motion to suppress, ruling as follows:
The Court heard the testimony that there were two other people present in the room during the time these activities were taking place; that at least one phone call was made to an unidentified person dealing with an unspecified matter. The witness testified that he was not aware of the nature of the conversation that was going on. The Court did not hear any testimony as to the defendant's familiarity with this particular minister. His testimony was he didn't attend church; there was no previous contact with clergy on matters of confidence. And the Court heard no testimony that would re-enforce the notion that the defendant had any expectations of privacy or, if you will, privilege, when he approached this particular minister.
The defendants then sought supervisory writs. The court of appeal denied the application finding that the trial court did not abuse its vast discretion. State v. Gray, 03-1240 (La.App. 4 Cir. 8/14/03), unpub. On review, this Court remanded the matter to the court of appeal for briefing, argument, and opinion. State v. Gray, 03-2604 (La.1/9/04), 864 So.2d 128. On remand, the Fourth Circuit reversed the trial court's judgment, finding that the trial court's original suppression of the statement was not manifestly erroneous, and that, in the absence of a finding by the trial court after the second hearing that it did not find Deonta credible in his testimony that he intended the statement to be confidential, or that he did not make the statement for spiritual or penitential considerations, the court of appeal found that it was required to uphold the plain, precise language contained in art. 511 and suppressed the statement. State v. Gray, 03-1240 (La.App. 4 Cir. 4/28/04), 874 So.2d 893. We granted the State's writ application. State v. Gray, 04-1197 (La.10/1/04), 883 So.2d 1003.

DISCUSSION
For only the third time in 80 years,[2] this Court has the opportunity to discuss Louisiana's clergyman privilege, presently incorporated in La. C.E. art. 511 but dating back in the criminal law to 1928 La. Acts 2, § 1, art. 477.[3] La. C.E. art. 511 provides as follows:

*1264 Art. 511. Communications to clergymen
A. Definitions. As used in this Article:
(1) A "clergyman" is a minister, priest, rabbi, Christian Science practitioner or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.
(2) A communication is "confidential" if it is made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.
B. General rule of privilege. A person has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual adviser.
C. Who may claim the privilege. The privilege may be claimed by the person or by his legal representative. The clergyman is presumed to have authority to claim the privilege on behalf of the person or deceased person.
Thus, there are three legal prerequisites to finding that the clergyman privilege applies. First, it must be determined that the person to whom the communication was received is a "clergyman." Second, it must be determined that the purpose of the communication was to seek spiritual advice or consolation. See State v. Berry, supra; State v. Tart, supra. Third, it must be determined that the communication was made privately and was not intended for further disclosure except to other persons present in furtherance of the purpose of the communication. However, even if those explicit requirements of the article are met, it must also be determined whether or not the communicant waived the application of the privilege. See La. C.E. art. 502(A) ("A person upon whom the law confers a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter.")
Whether the prerequisites to the recognition of the privilege are present is a determination to be made by the trial judge under La. C.E. art. 104(A).[4] In making this determination, the trial court considers whether the totality of the circumstances presented indicate that the statements made by the defendant are within the communications protected by the privilege. See State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116; State v. Berry, 324 So.2d 822 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976). A trial court's ruling on a motion to suppress is subject to an abuse of discretion standard. See State v. Hobley, 98-2460 (La.12/15/99), 752 So.2d 771, 790.
The testimony was uncontroverted that Reverend Woolridge was a full-time minister, licensed by his church, and working at the church of All Nations Ministry in Amite. Based on the evidence in the record, *1265 undoubtedly Reverend Woolridge was a "clergyman" within the meaning of the statute.
The second issue is whether the purpose of Deonta's visit to Reverend Woolridge was to seek spiritual advice or consolation. Unlike the factual situations presented in Berry and Tart, in this case the testimony was uncontroverted that Deonta visited Reverend Woolridge at his aunt's suggestion or insistence and that the purpose of his visit was "[t]o speak with a priest and for spiritual guidance." Further, once there, Reverend Woolridge prayed with him and Woolridge testified that Deonta appeared genuinely interested in changing his life. Woolridge further testified that he was there as a spiritual advisor and to "lead them to Christ." While Deonta testified that he did not know Woolridge prior to this visit, that he did not attend church, and that he was unaware of any sort of proceeding like confession in the Catholic Church, these factors do not necessarily preclude the privilege from attaching, but are only factors in considering the totality of the circumstances. As the court of appeal found, "the communicant may be a first time communicant if he or she reasonably believes, based upon the communicant's knowledge, that the communication will be held confidential and is motivated by penitential considerations." 874 So.2d at 904. While the trial court noted in denying the motion to suppress that the defendant was unfamiliar with the minister, and that he did not attend church and that he was a first time penitent, these factual considerations do not appear to have been directed at a finding that defendant did not speak to the minister for spiritual purposes, but rather toward a general finding that the privilege did not apply based upon the totality of the circumstances. Thus, the evidence supports Deonta's claim that the purpose of his visit was spiritual.
The next issue is whether the communication was made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication. There is no doubt that this communication was not made privately as two other persons were present, Jonta and Keyanta. However, as Deonta's aunt and a person with a spiritual connection to the minister, we find that Keyanta's presence was "in furtherance of the purpose of the communication." On the other hand, it is unclear why Jonta was there. He did not say a word and did not seek spiritual guidance. Furthermore, the fact that he was an alleged participant in the act confessed by Deonta does not cause this communication to be considered private. Jonta's presence was not in furtherance of the purpose of Deonta's communication.
The last issues, which are somewhat interrelated, are whether Deonta intended the communication to be confidential and/or whether he waived the privilege. "One indicia of the absence of intent to make a confidential communication is ... where the contents of the communication are shown to have been intended to be transmitted to a third party." Wright and Miller, Federal Practice and Procedure, § 561 (1992); La. C.E. art. 502(A) (the privilege is waived if the penitent voluntarily discloses or consents to disclosure of any significant part of the privileged matter); see also Perry v. State, 280 Ark. 36, 655, 655 S.W.2d 380 So. W.2d 380, 381 (1983) ("We agree with the trial court that Perry told about everyone he could about killing his wife and, therefore, waived any privilege he might claim [with respect to statements made to his minister]."); State v. Andrews, 187 Kan. 458, 357 P.2d 739, 744 (1960) ("Where the one making the privileged conversation tells the facts to other third parties, the privilege is waived and the minister, physician or lawyer may *1266 be allowed to testify as to the communication made to him."). In this case, there are at least two instances which indicate that either Deonta waived the privilege or did not have any expectation of privacy in his statement to Woolridge.
First, when Reverend Woolridge got on his cellular telephone to Pastor Sniff for advice on what he should do about the information imparted by Deonta, Deonta effectively waived any expectation in the confidentiality of Deonta's disclosure by remaining silent during the call and thereby consenting to disclosure of the information. Although Deonta testified at the reopened hearing that he did not know who was on the other end of the phone and did not know what was discussed because he "wasn't listening to them on the phone," Woolridge clearly told Pastor Sniff on the phone in Deonta's presence that Deonta had told him that he and Jonta had committed this crime. In addition, after Keyanta got on the phone with the pastor for a brief conversation of her own, she became emotional in front of all of them, because, according to Woolridge, she had received advice from Pastor Sniff to surrender the defendants to the police. Finally, after ending the call to the Pastor, Woolridge testified that he "instructed [Keyanta] on what [Sniff] had told me to do that she was to do, to turn them in, you know, tell her she should turn them in." That Deonta remained oblivious to the content of all these conversations and all these events is incredible. That fact that all this occurred in his presence clearly establishes that he either waived the privilege or had no expectation of privacy in the first place.
Secondly, the State argues that the privilege was waived because either Deonta or Jonta told Keyanta that they had shot the cab driver, thereby leading Keyanta to take them to see Reverend Woolridge. We agree that it is reasonable to conclude from Reverend Woolridge's testimony at the hearing that the cousins had previously informed Jonta's mother about the incidents, as she instructed the boys to "tell Brother Jeff what happened" once Woolridge arrived at the motel room.[5]
Accordingly, the State argues that by disclosing information about the attempted robbery/murder to third parties, and then by implicitly consenting to disclosure of the same information by Woolridge to his superior at his church, Deonta waived any privilege that he may otherwise have enjoyed. Thus, whatever the technical distinctions between the existence or applicability of the privilege and waiver of that *1267 privilege, the state contends that the end result remains the same; the cousins do not have the benefit of the privilege and may not invoke it at trial to preclude admission of Deonta's statements to Woolridge.
Although the trial court on original hearing granted the motion to suppress, finding that the presence of Jonta and Keyanta did not "diminish[ ] the sanctity or the applicability of the privilege within the facts of this particular case," the trial court found otherwise after the second hearing at which Deonta testified as to his intent in speaking with Woolridge. In that ruling, which is the ruling now under review, the trial court denied the motion to suppress, apparently relying in part on the fact that two other people were present in the room, at least one phone call was made to an unidentified person revealing the contents of the confession, and Deonta testified he was unaware of the nature of the phone conversation. However, while the trial court did not expressly say so, it clearly found Deonta's testimony as to his intent to be incredible, by concluding that it had "heard no testimony that would re-enforce the notion that the defendant had any expectations of privacy or, if you will, privilege, when he approached this particular minister."

CONCLUSION
Whether the clergyman privilege of La. C.E. art. 511 applies is determined under a totality of the circumstances test, in which all of the following requirements must be shown to exist: (1) it must be determined that the person to whom the communication was received is a "clergyman;" (2) it must be determined that the purpose of the communication was to seek spiritual advice or consolation; (3) it must be determined that the communication was made privately and was not intended for further disclosure except to other persons present in furtherance of the purpose of the communication; and (4) even if those explicit requirements of the article are met, it must also be determined whether or not the communicant waived the application of the privilege. In this case, although it is clear from the record that Reverend Woolridge was a clergyman under the article, and that Deonta consulted him and confessed to him for spiritual purposes, the requirements of confidentiality and lack of waiver were not shown. The trial judge was in the best position to judge the credibility of the witnesses and explicitly found that the testimony did not show that Deonta "had any expectations of privacy when he approached that particular minister." We agree, and find that, after a review of the record in its entirety, and considering the totality of the circumstances as described above, the clergyman privilege does not apply in this case and the trial court did not abuse its discretion in denying the motion to suppress.

DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed and the trial court judgment denying the defendant's motion to suppress is reinstated. The matter is remanded to the trial court for further proceedings.
REVERSED AND REMANDED.
CALOGERO, C.J., concurs and assigns reasons.
KIMBALL, J., concurs in the result and assigns reasons.
JOHNSON, J., dissents.
CALOGERO, Chief Justice, concurring.
I agree with the court of appeal that this case is a close one. However, I disagree with the appellate court's conclusion that the district court on remand did not *1268 make a finding with regard to the defendant's credibility. While the appellate court was correct that the district court did not make an explicit statement as to the defendant's credibility, the district court unquestionably discounted the defendant's testimony when it stated that it had "heard no testimony that would re-enforce the notion that the defendant had any expectations of privacy or, if you will, privilege, when he approached this particular minister." Given that the defendant testified he had expected his statement to remain confidential, implicit within the district court's factual finding is the determination that the defendant's testimony on this issue was not credible.
Accordingly, I concur in the majority's conclusion that the district court did not abuse its discretion in denying the motion to suppress the evidence. On the record before this court, I find no error in the district court's factual appreciation that the defendant, who is invoking the clergy-communicant privilege, failed to establish that his communication to Reverend Woolridge was "not intended for further disclosure ...," and thus was "confidential" as defined in La.Code Evid. art. 511(A)(2).
KIMBALL, Justice, concurring in result.
I agree with the result reached by the majority in this case; however, in my view, Deonta Gray did not waive the privilege or indicate that he did not have any expectation of privacy in his statement to Reverend Woolridge when he remained silent during Reverend Woolridge's telephone call to Pastor Sniff, his superior at the church. In my opinion, a clergyman's disclosure of confidential information to his superior solely for advice on what he should do in regards to this imparted information should not be considered a disclosure to a third-party which would defeat the privilege for confidential communications to a clergyman. This situation is analogous to that when an associate attorney seeks the advice of his supervising partner or attorney regarding a client communication, and would never be considered a waiver of the attorney-client privilege. See La. C.E. art. 506. Likewise, Reverend Woolridge's disclosure of Denota's statement to his superior, Pastor Sniff, for the purpose of determining his next course of action in this sensitive matter should not be considered a waiver of the clergyman's privilege.
NOTES
[1] The record is confusing and unclear as to whether Keyanta Gray is Deonta's aunt and Jonta's mother, or Deonta's mother and Jonta's aunt. As did the court of appeal, we will refer to Keyanta as Deonta's aunt and Jonta's mother, and note that under either factual scenario, the analysis of this case and the outcome of this decision would be the same.
[2] On both prior occasions, the Court found that the privilege did not apply because the communications at issue had purposes other than penitential revelation. In State v. Berry, 324 So.2d 822, 828-29 (La.1975), the defendant tried to pawn a watch to the sister of a minister, and, after she refused, asked to see the minister. The defendant confessed to killing a girl and taking her watch and essentially extorted money from the minister by informing him that he might hurt someone else. The court found that under these circumstances, the defendant's communication "was not made within the requisite nature of a confidential disclosure for religious purposes of a penitent to a clergyman seeking religious consolation." In State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, 143, a Reverend Posey, who also headed the local chapter of the N.A.A.C.P., responded to community concerns about the defendant's treatment in jail and possible civil rights violations by paying Tart a visit. The defendant informed him that he had committed the murders for which he had been charged and that he had confessed to the police voluntarily. Although the defendant also prayed with Posey, the record persuaded this Court that the main purpose for Posey's visit to the prison "was to question him as to whether his civil rights were violated," and that Posey was therefore acting in his capacity as the president of the local N.A.A.C.P. chapter and not as a clergyman.
[3] The privilege in La. C.E. art. 511 supplants not only former La. R.S. 15:477 pertaining to criminal matters but also La. R.S. 13:3734.1, which provided for an unqualified clergyman privilege in civil cases but which also provided explicitly that "[n]othing herein shall forbid any clergyman, duly ordained minister of the gospel, ordained priest, penitent, or person giving any communication from testifying concerning any matter, whether or not privileged, on a voluntary basis." La. R.S. 13:3734.1(D). The legislature repealed the statute (and La. R.S. 15:477) in 1992 when it adopted the new Code of Evidence. 1992 La. Acts 376.
[4] La. C.E. art. 104A provides:

Questions of admissibility generally. Preliminary questions concerning the competency or qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of Paragraph B. In making its determination, it is not bound by the rules of evidence except those with respect to privileges.
[5] The State also argues that Deonta and Jonta waived the privilege because right after the shooting occurred, they admitted to another individual that they had robbed and shot the cab driver. According to the transcript of the preliminary hearing on September 11, 2002, at which Detective Armando Asaro described the circumstances which led him to arrest the defendants, Detective Asaro testified that they developed Jonta and Deonta as suspects because a witness gave them a taped statement which established that just after the shooting occurred, Jonta and Deonta came to the witness's residence and Jonta told him that they had just shot a cab driver.

In making this argument, the State relies on and attaches as exhibits to its writ application a copy of the supplemental police report and copies of statements made to the police by Tory Borden, who is the third party witness referred to in the preliminary hearing transcript. Although these reports and statements were not introduced as evidence at the motion to suppress or ever filed into the record at anytime, and therefore cannot be considered by this court, the transcript of the preliminary hearing clearly is part of the record and was available for the trial court's consideration, as the court reporter's transcription certificate bears the date of September 26, 2002, well before the motion to suppress was heard. However, as the trial court evidently did not consider the transcript of the preliminary hearing in ruling on the motion to suppress, we do not rely on this statement in affirming the trial court's ruling.