CARAWAY, J.
| lAfter a grand jury indictment charged Sharon Mudd with second degree murder she was convicted of manslaughter in a bench trial. She received a sentence of 22 years at hard labor and was granted an out-of-time appeal which challenges her sentence and conviction. We affirm.

Facts

Claire Brouillette was stabbed 36 times by Sharon Mudd in the early morning hours of March 3, 2007. The victim died three days later and Mudd was later charged by grand jury indictment with her second degree murder. Mudd was a resident of By Grace Recovery House when she allegedly stabbed Brouillette. She had a long history of mental disease including bipolar disorder. A sanity commission was appointed on February 29, 2008, after Mudd claimed she “was taken off her pre *576 scribed medication shortly before the incident in question and may not [have] been able to distinguish between right and wrong at the time [the] alleged crime occurred.” Based on physicians’ recommendations, Mudd was found competent to stand trial.[1] Mudd proceeded to trial without entry of a plea of not guilty and not guilty by reason of insanity.
On the morning of the bench trial, Mudd filed a motion in limine claiming that the clergyman privilege of La. C.E. art. 511 protected the contents of a conversation Mudd had with the state’s witness, Jeannie L. | gHerman. After hearing oral arguments, however, the court was unable to rule on Mudd’s motion before a determination of Herman’s role. The court deferred judgment on the motion. After hearing the testimony of Herman, the trial court later denied Mudd’s motion during the trial.
The state’s first witness at trial was Kathleen Brouillette Frazier, the mother of the victim, Claire Brouillette. Frazier testified that on March 3, 2007, she received information that Brouillette had been hospitalized after an attack and was in critical condition. Brouillette remained on a ventilator until March 5, 2007, when she was declared dead. Frazier admitted that Brouillette was receiving treatment at By Grace Recovery House. According to Frazier, Brouillette was “one month away from being discharged” when she was attacked.
Corporal J. Cisco was the first Shreveport police officer to encounter Mudd. He responded after the dispatcher received an emergency 911 call from Brouillette. A tape of that call was played for the court and on the tape, Brouillette identified Mudd as her attacker as she was being assaulted. Corporal Cisco arrived on the scene and saw “two females running west from the 2600 block of Bibb Street.” Corporal Cisco testified,
one of the females run [sic ] to my car and fell across the hood of the car, collapsing in front of my car, which was later identified as the victim. The suspect seen [sic] the police car and she immediately stopped, turned the knife on herself and started backing up.
Corporal Cisco identified Mudd as the suspect, and Brouillette as the victim. Corporal Cisco testified that Mudd was chasing Brouillette with “a foot | slong” filet knife. Brouillette was not fighting Mudd or provoking her in any way. Corporal Cisco described the scene as follows:
I drew my duty weapon and held [Ms. Mudd] away from the victim as the fire department attended to the victim. Once my back-up, Corporal Baurichter, got there, I advised him that I was going to taze [sic ] her. We continued to give her loud verbal commands to drop the knife, she continued to just scream “shoot me, shoot me.” We went around and around in a circle, a couple of circles. Officer Baurichter arrived. I advised him that I was going to taze [sic ] her if she didn’t drop the knife. He pulled his service weapon. I put my service weapon up, and pulled the tazer [sic ] and we shot her and took her into custody.
Corporal Cisco testified that Mudd was pointing the knife at her chest when she *577 yelled “shoot me, shoot me.” She did not threaten the officers or conceal the knife.
Corporal Baurichter corroborated Corporal Cisco’s description of her arrest. He also testified that he and Sergeant J.J. Silva went to the By Grace Recovery House to make sure there were no other victims. While Sergeant Silva secured the weapon and took pictures of the crime scene, Corporal Baurichter transported Mudd to the police station. Corporal Bau-richter read Mudd her rights and questioned her regarding the incident. Mudd did not remember what happened, but she said she was on five different medications for depression. Later, Corporal Bauri-chter was asked to take Mudd to “LSU” because “she told people at the jail she was suicidal.” He testified that it was normal procedure to transfer suicidal inmates to LSU for evaluation.
Stephanie Williams-Betters, the owner of By Grace Recovery House, testified for the state. Williams-Betters described the house as “a | transitional home for women” who were either “transferring from jail” or “recovering from alcohol or drugs” or “from abuse.” Williams-Betters said there were no caretakers or nurses on staff. She explained, “it wasn’t a hospital or anything, it’s just a — it’s like a boarding home.” Williams-Betters testified that the residents had a curfew and had to work, but “were basically on their own.” She knew some of the women required medication, but she testified that they were responsible for taking it themselves. The women were permitted to keep the medicine in their rooms, but they could give it to the house manager if they were concerned about theft. If they did, the house manager was expected to return their medication upon request.
The By Grace Recovery House routinely admitted women with mental issues. Williams-Betters did not think the policy was abnormal, and that residents with mental issues were required to abide by the same rules as everyone else. Prior to their admission, Williams-Betters personally interviewed Brouillette and Mudd. According to Williams-Betters, Mudd did not cause problems before her arrest, she never received a complaint regarding Mudd’s hygiene and was unaware there were problems between Mudd and Brouil-lette. Williams-Betters testified she knew Mudd was bipolar, and recently released from a “behavioral home.” She also knew Mudd was heavily medicated.
After Williams-Betters was informed of Brouillette’s hospitalization, she called Herman. Although Williams-Betters and Herman are friends, Williams-Betters denied asking Herman to visit Ms. Mudd at the Shreveport city jail. Williams-Betters was aware that Herman frequented the By Grace ^Recovery House. She testified that Herman “came over often and she spoke with [the women].” Williams-Betters was unaware that Herman presented herself as a “spiritual leader.” She testified that Herman said “she loved God and thanked God all the time, but I didn’t know * * * but I don’t know anything about that.” Williams-Betters testified that Herman did not conduct individual counseling sessions with the women at the By Grace Recovery House. Yet, she would often just sit down and talk with the women.
Herman initially gave testimony concerning her relationship with Mudd and how she presented herself to Mudd at the jail. She denied that she held herself out as a minister or counselor. It was then that the trial court ruled that Mudd’s statements to Herman were admissible. Herman was asked to recall the content of her conversation with Mudd. According to Herman, Mudd said that she attacked Claire Brouillette because she was “mad at *578 Claire.” Mudd told Herman, “[Brouillette] wouldn’t quit picking on her about her chores that she needed to do.” According to Herman, Mudd said she “waited for everybody to leave that night” and “thought about it and thought about it.” Mudd told Herman she “went and got a knife out of the kitchen,” and entered “the bedroom where Claire was sleeping ... and attacked her with the knife.” Mudd said that when the fighting stopped, “Claire started running.” Herman then asked Mudd if she planned the attack. According to Herman, Mudd said “she planned it, she thought about it and thought about it.”
|fiMudd’s mother, Mary Greenwald, was Mudd’s sole witness. Greenwald testified that Mudd had previously been admitted to hospitals in Louisiana and Indiana. Greenwald cared for Mudd’s daughter while she was away. She also cared for Mudd when she was released from the hospital. While in her care, Mudd was problematic, because she wouldn’t take her medicine and she would act irrationally. Greenwald testified that Mudd was incapable of taking her medicine on her own. After Mudd was arrested, her belongings were released to her mother. Mudd’s medication was among the effects her mother received. Greenwald testified that she was “amazed” after she counted the pills because Mudd’s medication had not been exhausted. According to Greenwald, Mudd received her medication on January 24, 2007, and it should have been used in one month.
During closing arguments, Mudd’s counsel admitted Mudd killed Brouillette but argued that she should be convicted of manslaughter because she was unmedicat-ed and unable to control her temper. The trial judge agreed and entered the responsive verdict of manslaughter.
After considering the aggravating and mitigating circumstances, the court sentenced Mudd to 22 years at hard labor with credit for time served. The trial court denied Mudd’s motion to reconsider sentence on June 23, 2010. Mudd was granted an out-of-time appeal challenging the denial of her motion in limine and sentence.

Discussion

Mudd urges error in the trial court’s ruling on her motion in limine which allowed Herman to testify regarding Mudd’s statement to her. 17Immediately prior to Herman’s testimony, Williams-Betters testified that she was unaware that Herman presented herself to the residents as a spiritual leader and that Herman was not considered as having a clergy relationship with the residents. Herman denied presenting herself to Mudd as a clergy person.
The clergyman privilege is embodied in La. C.E. art. 511 (Communications to clergymen). La. C.E. art. 511 provides:
A. Definitions. As used in this Article:
(1) A “clergyman” is a minister, priest, rabbi, Christian Science practitioner, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.
(2) A communication is “confidential” if it is made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.
B. General rule of privilege. A person has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication by the person to a clergyman in his professional character as a spiritual advisor.
C. Who may claim the privilege. The privilege may be claimed by the person *579 or by his legal representative. The clergyman is presumed to have authority to claim the privilege on behalf of the person or deceased person.
The supreme court interprets Article 511 as follows:
Whether the clergyman privilege of La. C.E. art. 511 applies is determined under a totality of the circumstances test: (1) it must be determined that the person to whom the communication was received is a “clergyman;” (2) it must be determined that the purpose of the communication was to seek spiritual advice or consolation; (3) it must be determined that the communication was made privately and was not intended for further disclosure except to other persons present in furtherance of the purpose of the communication; and (4) even if those explicit requirements of the article are met, it must also |8be determined whether or not the communicant waived the application of the privilege.
State v. Gray, 04-1197 (La.1/19/05), 891 So.2d 1260, 1267.
A person upon whom the law confers a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. La. C.E. art. 502(A).
Whether the prerequisites to the recognition of the privilege are present is a determination to be made by the trial judge. State v. Gray, supra at 1264; La. C.E. art. 104(A). A trial court’s ruling on a motion to suppress is subject to an abuse of discretion standard. Id. In determining whether a defendant has established the legal prerequisites for the clergyman privilege to apply, the trial court considers whether the totality of the circumstances presented indicate that the statements made by the defendant are within the communication protected by the privilege. Id. Relevant to this issue, Herman testified that she is an esthetician with 35 years’ experience. She volunteers at numerous facilities and halfway houses around town and occasionally visited the By Grace Recovery House to bring clothes to women. She would also “encourage the girls; try to help them find jobs and so forth.” Herman denied counseling the women individually or in a group. She denied going to the home as a minister. Herman testified that she has never referred to herself as a minister although she agreed that she has engaged in ministering to people. Herman explained the phrase ministering to people means “helping them, encouraging them to have jobs, and just' encourage them.”
[ ^Herman encountered Mudd while volunteering at the By Grace Recovery House. She would “just say hello” and “how you doing.” She “never really had a conversation with her.” Herman did not counsel Mudd at the House. Similarly, the women did not discuss God.
Herman recalled her city jail conversation with Mudd. According to Herman, she did not hold herself out to be a minister to Mudd, or anyone else. She did not hold herself out to be a counselor, nor did she go to minister to Mudd. She simply “wanted to find out what happened at the halfway house.” It took Mudd a few minutes to recognize her from the house. When Mudd asked why she was there, Herman said “Vertrice [the house manager] and Stephanie wanted to know how she was doing.” Herman did not lead Mudd to believe the conversation would be private. After Herman spoke with Mudd, she asked Mudd if she wanted to pray. The women prayed before Herman left.
From the totality of the evidence before the court, the trial court properly conclud *580 ed that Herman did not hold herself out as a minister at the By Grace Recovery House or in her meeting with Mudd at the jail. Likewise, there is no evidence that Mudd would have reasonably believed that Herman was performing as a clergy person on the day of her jail conversation with Herman. Further, in accepting that testimony, the court could have determined that on the day of the conversation the purpose of Herman’s visit with Mudd was for nothing more than fact-gathering. Accordingly, we find no error in the ruling of the trial court allowing Herman’s testimony.
|10In her other assignment of error, Mudd claims that the trial court’s sentence of 22 years is constitutionally excessive because she is in need of mental health treatment, not imprisonment.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. State v. Dorthey, 623 So.2d 1276 (La.1998). First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance, so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890, writ denied, 07-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Swayzer, 43,350 (La.App.2d Cir.8/13/08), 989 So.2d 267, writ denied, 08-2697 (La.9/18/09), 17 So.3d 388. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259, writ denied, 08-2341 (La.5/15/09), 8 So.3d 581. There is no requirement that specific matters be given any | particular weight at sentencing. State v. Shumaker, 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277, writ denied, 07-0144 (La.9/28/07), 964 So.2d 351.
Second, a sentence must not violate Article 1, § 20 of the Louisiana Constitution. A sentence will violate the constitution if it is grossly out of proportion to the seriousness of the offense, or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, supra; State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La.1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La.1992); State v. Robinson, 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379; State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864. The trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of discretion, a sentence should not be set aside as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Thompson, 25,583 (La.App.2d Cir.1/19/94), 631 So.2d 555.
We find adequate La. C. Cr. P. art. 894.1 compliance. Before pronouncing sentence, the trial court took particular *581 notice “that there is an undue risk that during a period of a suspended sentence or probation that the defendant would commit another crime.” The court also determined that Mudd was in need of correctional treatment or a custodial environment that can be provided most effectively by her commitment to an institution. The | i2court continued by listing the following aggravating and mitigating circumstances:
The defendant’s conduct during the commission of the offense manifested deliberate cruelty to the victim.... The offender used a dangerous weapon in the commission of the offense_ The victim was particularly vulnerable or incapable of resisting due to her own disability.... The impact statements from the ■victim’s family.... The age of the defendant. ... [The lack of] significant ... prior criminal activity_ [The] defendant[’s] work history.... The [fact] that the defendant ... had not taken her medication.... [The defendant’s family] who tried to support her during her difficult times ... [and the fact that the] defendant is still in need of mental health intervention.
Nor do we find the imposed sentence to be constitutionally excessive. For her manslaughter conviction Mudd faced maximum sentencing exposure of 40 years at hard labor. Thus, she received a mi-drange sentence. In fashioning the imposed sentence to the circumstances of this case, the trial court clearly considered Mudd’s mental state and lack of criminal record as mitigating factors. Likewise the court considered that the brutal nature of the crime at hand was precipitated by Mudd’s “repeated failure to comply with treatment recommendations,” which ultimately renders her “dangerous to herself and others.”
While Mudd’s mental issues are evident on the record before us, nevertheless, two mental experts had no difficulty in finding her able to tell right from wrong at the time of the offense. Neither was her competency to stand trial seriously contested. Evidence that Mudd premeditated her attack of Brouillette is contained in the record. Thus, a second degree conviction was supported by the facts. The trial court’s manslaughter conviction greatly reduced Mudd’s potential sentencing exposure. While Mudd’s |1smental illness cannot be disregarded, it is equally impossible to ignore the brutal nature of this offense which resulted in the death of an innocent victim. In the absence of the establishment of the defense of not guilty by reason of insanity, the criminal justice system of this state requires that such violent criminal acts be punished through accountability by incarceration. Bearing all of these factors in mind, we cannot conclude that the 22-year sentence imposed for this brutal attack shocks the sense of justice or is grossly disproportionate to the harm done to society. Thus, the sentence is affirmed.
CONVICTION AND SENTENCE AFFIRMED.

. Doctors George Seiden and Richard Williams were appointed by the court. The two doctors interviewed Mudd and diagnosed her with bipolar disorder. Although they considered Mudd’s condition severe, they determined she was fit to stand trial. They also indicated the belief that Mudd knew "right from wrong” when the alleged offense occurred. Dr. Seiden recommended that Mudd be maintained in a secure forensic psychiatric facility due to his fear that her condition would deteriorate.