943 So.2d 412 (2006)
STATE of Louisiana
v.
Pamela Darlene TEMPLET.
No. 2005 KA 2623.
Court of Appeal of Louisiana, First Circuit.
August 16, 2006.
*414 Scott M. Perrilloux, District Attorney, Morgan Griggs, Assistant District Attorney, Amite, Counsel for State of Louisiana.
A. Wayne Stewart, Livingston, Counsel for Defendant/Appellant Pamela Darlene Templet.
Before: PARRO, MCDONALD and HUGHES, JJ.
MCDONALD, J.
The defendant, Pamela Darlene Templet, was charged by grand jury indictment with second degree murder (count one), a violation of La. R.S. 14:30.1, and attempted second degree murder (count two), a violation of La. R.S. 14:30.1 and 14:27. She pled not guilty to both charges, and after a trial by jury, was convicted of the responsive offense of manslaughter on count one, a violation of La. R.S. 14:31, and the responsive offense of aggravated battery on count two, a violation of La. R.S. 14:34. The defendant moved for a new trial and for a post-verdict judgment of acquittal. The trial court denied both motions. The defendant was sentenced to imprisonment at hard labor for ten years on count one and one year on count two. The trial court ordered that the sentences run concurrently without benefit of probation, parole, or suspension of sentence. The defendant now appeals urging three assignments of error as follows:
1. The district court erred by not overturning the decision of the jury where the facts of the case do not support a verdict of guilty to manslaughter in that it is clearly pointed out on the 911 tape that this was either a sudden emergency or self-defense.
2. The district court erred by not overturning the decision of the jury where the indictment incorrectly named the victim Robert Byrd when no evidence was offered regarding a Robert Byrd.
3. The district court erred by not overturning the jury's decision of finding Defendant guilty of aggravated battery on Randy Byrd when the evidence presented at trial reflects that the Defendant may have committed an aggravated assault upon Mr. Byrd, but not an aggravated battery.
Finding no merit in the assigned errors, we affirm the defendant's convictions. *415 Due to patent error, we amend the sentences, and as amended, we affirm the sentences and remand to the trial court with instructions.

FACTUAL BACKGROUND
On June 6, 2004, Randy Byrd ("Byrd") spent the evening with a female companion, Juanita Garlington ("Garlington"), in his Denham Springs, Louisiana residence. Sometime around midnight, the defendant, Byrd's ex-girlfriend, arrived at the residence. Byrd opened the door, and the defendant entered. Before leaving the residence, the defendant fired a single shot at Byrd and several shots at Garlington. Garlington was fatally wounded by one of the gunshots. The defendant and Byrd, the only living eyewitnesses to the incident, gave differing accounts of the events leading up to the shootings.
Byrd testified that he and Garlington were asleep in bed when he heard banging on his door. When Byrd looked out of the window to determine the source of the disturbance, he observed the defendant's vehicle in his driveway. Byrd went to the door to try to convince the defendant to go home. By then, the defendant was continuously banging on the door, and yelling, "Open up the door. Open up the door." Byrd opened the door and the defendant rushed in. The defendant repeatedly asked Byrd who was present in the house with him. According to Byrd, the defendant angrily demanded, "Who's your f____ing bitch, where's she at? Bring her out." The defendant then ran down the hall towards the master bedroom, still trying to determine who was in the house. Byrd followed behind her. Garlington, who apparently was hiding, was not observed in the master bedroom. The defendant searched under the bed and then started towards the closet. Byrd pulled her back, preventing her from looking in the closet, and a struggle ensued. According to Byrd, the defendant fell onto the floor, face-first during the struggle. When she got up, the defendant stated, "I'll take care of you f____ers" and headed towards the front door. The defendant ran outside to her vehicle. Byrd yelled to Garlington to stay wherever she was. Shortly thereafter, the defendant returned with a handgun. Byrd unsuccessfully attempted to prevent the defendant from reentering the residence. Inside, the defendant aimed the gun at Byrd and again asked, "Where's your f____ing bitch, where's she at? I'm tired of getting f____d over. I want her. Where's she at?"
At some point thereafter, Byrd successfully disarmed the defendant and gained control of the handgun. He removed the clip from the weapon. Byrd claimed the defendant frantically continued throughout the house in search of Garlington. Byrd eventually managed to calm the defendant and promised to return her handgun if she agreed to leave the residence. The defendant told Byrd that she would leave once he returned the gun. Byrd threw the gun on the bed. The defendant picked up the gun and demanded that Byrd return the bullets. According to Byrd, once the defendant realized that a bullet was left inside the gun, she pointed the gun at Byrd and demanded, "Give me my f____ing bullets." Byrd promised to return the bullets if the defendant would leave. When the defendant stated that she would leave, Byrd threw the bullet clip onto the bed. According to Byrd, he then turned his back to the defendant to look down the hall to see if he saw Garlington. When he turned back, Byrd noticed that the defendant had already placed the clip inside the gun. Byrd asked, "What are you going to do, shoot me?" The defendant, who was standing approximately one and one-half feet from Byrd, nodded her head "yes," *416 raised the weapon, pointed it at Byrd and fired.
Byrd testified that he felt the "concussion of the wind" from the bullet and thought he was hit. He grabbed his side and stumbled down the hall. The defendant followed Byrd as he walked out of the front door and down the steps. Byrd collapsed on the ground near the bottom of the steps. Byrd asked the defendant to come outside and help him. The defendant walked to the front door but did not exit the residence. She removed her cellular telephone, dialed 911 and informed the operator that she just shot a man.
According to Byrd, once the 911 call was completed, the defendant took three steps backwards from her position in the doorway and "bolted" down the hall towards the master bedroom again. Byrd jumped up and attempted to follow her. However, he tripped over the robe he was wearing and fell to the floor. Byrd then heard two shots. He also heard Garlington scream on the second shot. As he moved towards the bedroom, Byrd heard another shot. Fearful, Byrd then turned around, ran back out of the front door and hid near the corner of the house. Shortly thereafter, the defendant emerged from the house and began calling for Byrd. When Byrd did not respond, the defendant entered her vehicle and left. Byrd re-entered the residence to find Garlington lying on the bed in the master bedroom. She had been shot.
In his initial taped statement to the police, Byrd gave the same account of the events except he did not mention ever disarming the defendant or handling the gun. In a subsequent statement, Byrd's account of the events immediately preceding the fatal shooting included his handling of the weapon and bullet clip.
The defendant, on the other hand, provided a totally different account of the events. According to the defendant, she and Byrd had plans to meet at his residence on the night in question. They had spent the previous night together at Byrd's residence and agreed to meet again. The defendant admitted that she had been out drinking that night and was intoxicated when she arrived at Byrd's residence.
The defendant stated when she arrived at Byrd's residence she observed a vehicle that she believed belonged to Kevin, a mutual friend. She knocked on the door, and Byrd answered and greeted her with a kiss. She and Byrd then sat at the table and shared a marijuana cigarette. The defendant observed her handgun sitting on the table. She had allowed Byrd to keep the gun for her. When the defendant picked up the gun, Byrd took the gun away and took the clip out. According to the defendant, she and Byrd engaged in a cordial conversation regarding the bullets for the gun as they continued to smoke the marijuana cigarette. The defendant claimed she got up to go to the bathroom and Byrd asked her, "What in the f____k are you doing?" Byrd then attacked her, ultimately causing her to fall onto the floor in the spare bedroom. As she tried to get up, Byrd attacked again, and a struggle ensued. During the struggle, the weapon fired. Byrd fell onto the floor in the hallway and pretended to be shot. Believing that Byrd had been hit, the defendant used her cellular telephone to call 911. The defendant told the operator that she had just shot a man. According to the defendant, as she talked with the 911 operator, an individual later determined to be Garlington grabbed her from behind, and they struggled. Byrd got up and joined in the struggle. The defendant claimed she, Byrd and Garlington all struggled over the gun. During the struggle, the gun went off a couple of times. Still on the phone, *417 the defendant claims she then told the 911 operator that she had shot two people.
The defendant left Byrd's residence before any medical personnel and/or police arrived. From her car, the defendant again contacted 911 and stated that she had shot two people. The defendant spoke to the 911 operator as she drove home. At home, the defendant did as instructed and had her daughter call 911 again from the land line. The defendant was subsequently arrested in her home.
The defendant denied Byrd's claim of a jealous rage. She stated that she and Byrd were not in a serious relationship and they both openly dated other people. The defendant further testified that she was unaware of Garlington's presence in the residence prior to the attack.
An audiotape of the defendant's initial 911 call was introduced into evidence and played for the jury. The tape was consistent with the defendant's account of the events. On the tape, the defendant can be heard telling the operator that she shot Byrd. During the conversation, as the defendant attempted to apprise the operator of her location, several banging or popping noises are audible in the background. The defendant also seems to have become engaged in a struggle. The defendant requested immediate assistance indicating that she shot "two people." The defendant then explained to the operator, "The girl just got me from behind."
Deputy Brad Treuil of the Livingston Parish Sheriff's Office testified that a partially smoked marijuana cigarette was found on the kitchen table at Byrd's residence. Although Byrd denied it in his trial testimony, Deputy Treuil testified that in response to police questioning, Byrd admitted that he smoked marijuana with the defendant before the shooting.
Edward Corrigan, an expert in forensic pathology, testified that he performed an autopsy on Garlington. Corrigan testified that Garlington sustained a "near contact" gunshot wound to the left forehead, a distance wound to the chest, and a wound to the right hand. Corrigan stated that the same bullet that caused the hand wound, also penetrated the chest. Corrigan further testified that muzzle markings, smoke and soot found on Garlington's hand indicate that she had her hand on the gun when it was fired. Corrigan opined that all of the wounds were consistent with some sort of struggle.

ASSIGNMENT OF ERROR NO. 1
In her first assignment of error, the defendant contends the evidence presented at trial was insufficient to support the manslaughter conviction. She specifically argues that the state failed to prove that she did not act in self-defense or in response to a sudden emergency when she shot Garlington.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See La.C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988). When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 requires that assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. See State v. Wright, 98-0601, p. 2 (La.App. 1st Cir.2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La.10/29/99), 748 So.2d 1157, and XXXX-XXXX (La.11/17/00), 773 *418 So.2d 732. This is not a separate test to be applied when circumstantial evidence forms the basis of a conviction; all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Ortiz, 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Since specific intent is a state of mind, it need not be proved as a fact but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126, 1127 (La.1982).
The defendant in the instant case was convicted of manslaughter. La. R.S. 14:31 defines manslaughter as follows:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.
Sudden passion and heat of blood are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense, which demonstrate a degree of culpability less than that present when the homicide is committed without them. The state does not bear the burden of proving the presence or absence of these mitigatory factors. See State v. Snyder, 98-1078, p. 4 (La.4/14/99), 750 So.2d 832, 837-838. Moreover, a defendant need not affirmatively establish sudden passion or heat of blood provocation; the jury is free to infer mitigating circumstances from the evidence. State v. Lombard, 486 So.2d 106, 111 n. 9 (La. 1986).
In the instant case, the defendant does not deny that she fired the shot that killed Garlington. She insists, however, that the homicide was justifiable because she acted in self-defense in firing the weapon after Garlington attacked her from behind. The defendant believed that she was in imminent danger of losing her life or receiving great bodily harm.
La. R.S. 14:20 provides, in pertinent part:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

*419 (2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
In State v. Williams, XXXX-XXXX, pp. 5-6 (La.App. 1st Cir.12/28/01), 804 So.2d 932, 939, writ denied, XXXX-XXXX (La.2/14/03), 836 So.2d 135, this court set out the standard of review for sufficiency of the evidence in self-defense homicide cases as follows:
When the defendant in a homicide prosecution claims self-defense, the state must prove beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Bates, 95-1513, p. 9 (La.App. 1st Cir.11/8/96), 683 So.2d 1370, 1375. La. R.S. 14:20(1) provides that a homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save him from that danger. On appeal, the relevant inquiry is whether or not, after viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found beyond a reasonable doubt that the defendant did not act in self-defense. State v. Fisher, 95-0430, p. 3 (La.App. 1st Cir.5/10/96), 673 So.2d 721, 723, writ denied, 96-1412 (La.11/1/96), 681 So.2d 1259.
When a defendant claims self-defense in a homicide case, the state bears the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. State v. Rosiere, 488 So.2d 965, 968 (La.1986). Thus, the precise issue presented for our review is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the state proved beyond a reasonable doubt the defendant did not act in self-defense.
The manslaughter verdict returned in this case indicates that the jury either outright rejected the defendant's self-defense claim or concluded that the homicide was not necessary to preserve the defendant's life. Upon our review of the record in this case, viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found the evidence sufficient to support the manslaughter conviction. The appellate court is constitutionally precluded from acting as a thirteenth juror in assessing what weight to give evidence in criminal cases; this rests solely on the sound discretion of the trier of fact. State v. Mitchell, 99-3342, p. 8 (La.10/17/00), 772 So.2d 78, 83. Herein, even if the jury believed the defendant's account of the events, they could have reasonably found that the fatal force utilized by the defendant was not reasonable under the circumstances. Even if Garlington attacked the defendant from behind and created what the defendant deemed a "sudden emergency," there was no evidence that the victim was armed with any weapon. Thus, the defendant could not have reasonably believed that the killing of Garlington was necessary to save herself from danger. The defendant's claim of a "sudden emergency" is consistent with a finding of manslaughter, as opposed to second degree murder. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 2
In her second assignment of error, the defendant contends the indictment was *420 defective because it erroneously alleged that the victim of the attempted second degree murder charge was "Robert Byrd" and not "Randy Byrd." The defendant argues since no evidence was presented regarding a Robert Byrd, the defect in the indictment is substantial and constitutes reversible error. We disagree.
A defendant has a constitutional right to be advised, in a criminal prosecution, of the nature and cause of the accusations against him. La. Const. art. I, § 13. Louisiana Code of Criminal Procedure article 464 provides, "The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged." The bill of information must contain all the elements of the crime intended to be charged in sufficient particularity to allow the defendant to prepare for trial, to enable the court to determine the propriety of the evidence that is submitted upon the trial, to impose the appropriate penalty on a guilty verdict, and to protect the defendant from double jeopardy. State v. Comeaux, 408 So.2d 1099, 1106 (La.1981). When the name of the person injured is substantial and not merely descriptive, it shall be stated in the indictment. La.C.Cr.P. art. 473.
A defendant may not complain of technical insufficiency in an indictment for the first time after conviction, when the indictment fairly informed the accused of the charge against him and the defendant is not prejudiced by the defect. State v. McLean, 525 So.2d 1251, 1252 n. 1 (La. App. 1st Cir.), writ denied, 532 So.2d 130 (La.1988); see La.C.Cr.P. art. 487. After the verdict a defendant ordinarily cannot complain of the insufficiency of an indictment "unless it is so defective that it does not set forth an identifiable offense against the laws of this state, and inform the defendant of the statutory basis of the offense." State v. Robicheaux, 412 So.2d 1313, 1321 (La.1982).
As the defendant correctly asserts, the indictment in this case alleges that the defendant committed the offense of attempted second degree murder by attempting to kill "Robert Byrd." At trial, the victim of the attempted second degree murder charge testified that his name is "Randy Byrd." The record is devoid of any indication that the indictment was ever amended to correct the first name of the victim of this offense. Initially, we note the defendant did not object or file a motion to quash contesting the validity of the indictment. We also note that the gravamen of the crime of attempted murder, whether first or second degree, is the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal. State v. Huizar, 414 So.2d 741, 746 (La.1982). Thus, the identity of the victim is merely descriptive and is not an essential element of this offense. Furthermore, the defendant herein does not allege any specific prejudice resulting from the error in the indictment. The police reports and other documents provided by the state during discovery stated the correct name of the victim (Randy Byrd) of the attempted second degree murder charge. Byrd, the defendant's ex-boy-friend and someone with whom the defendant was well acquainted, was consistently referred to as "Randy" throughout the record. Therefore, we find that the record contained a sufficient designation of the actual victim and no advantage can be taken of the technical error in the indictment. See State v. Scoby, 536 So.2d 615, 617 n. 2 (La.App. 1st Cir.1988), writ denied, 540 So.2d 339 (La.1989). This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 3
In her third assignment of error, the defendant avers the evidence presented *421 at trial was insufficient to support the aggravated battery conviction. Specifically, the defendant argues because the evidence does not prove that Byrd was ever actually shot, there was no battery and thus, insufficient evidence of aggravated battery.
The defendant was charged with attempted second degree murder. Absent a contemporaneous objection to the giving of instructions on a responsive verdict, a defendant may not complain if the jury returns with a legislatively approved responsive verdict, even where there is insufficient evidence to support such a verdict, provided that the evidence is sufficient to support the charged offense. State v. Schrader, 518 So.2d 1024, 1034 (La.1988); State ex rel. Elaire v. Blackburn, 424 So.2d 246, 251 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983). In such a case, a jury has the right to "compromise" between the charged offense and a verdict of not guilty. State v. Charles, XXXX-XXXX, p. 4 (La.App. 3rd Cir.5/9/01), 787 So.2d 516, 519, writ denied, XXXX-XXXX (La.4/19/02), 813 So.2d 420. Jurors may return a "compromise" verdict for whatever reason they deem to be fair, so long as the evidence is sufficient to sustain a conviction for the charged offense. See Blackburn, 424 So.2d at 251.
In the instant case, the trial court charged the jury regarding aggravated battery without a timely defense objection. Louisiana Code of Criminal Procedure article 814(C) specifically provides that such an objection can be made at the conclusion of the trial after all the evidence has been presented. The failure to object will bar relief regarding sufficiency of the evidence, but only if the evidence is sufficient to sustain the greater offense that was charged in the indictment. See State v. Camp, 571 So.2d 195, 200 (La.App. 4th Cir.1990). Aggravated battery is a legislatively approved responsive verdict to a charge of attempted second degree murder. La.C.Cr.P. art. 814(A)(4). Accordingly, if the evidence was sufficient to support a conviction for the charged offense, the defendant has no basis for complaint. Thus, it is appropriate for us to review the sufficiency of the evidence to support a conviction for attempted second degree murder.
Louisiana Revised Statute 14:30.1(A) defines second degree murder, in pertinent part, as the killing of a human being: (1) when the offender has a specific intent to kill or to inflict great bodily harm; or (2)(a) is engaged in the perpetration or attempted perpetration of . . . aggravated burglary . . . armed robbery . . . even though the offender has no intent to kill or to inflict great bodily harm. Under La. R.S. 14:27(A), a person is guilty of an attempt to commit an offense when he has a specific intent to commit a crime and "does or omits an act for the purpose of and tending directly toward the accomplishing of his object."
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). To be guilty of attempted murder, a defendant must have the specific intent to kill and not merely the specific intent to inflict great bodily harm. State v. Maten, XXXX-XXXX, p. 5 (La.App. 1st Cir.3/24/05), 899 So.2d 711, 716, writ denied, XXXX-XXXX (La.1/27/06), 922 So.2d 544. Specific intent to kill can be implied by the intentional use of a deadly weapon such as a knife or a gun. See State v. Brunet, 95-0340, p. 8 (La.App. 1st Cir.4/30/96), 674 So.2d 344, 349, writ denied, 96-1406 (La.11/1/96), 681 So.2d 1258. Further, specific intent may be inferred *422 from a defendant's actions and the circumstances. State v. Broaden, 99-2124, p. 18 (La.2/21/01), 780 So.2d 349, 362, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001). Deliberately pointing and firing a deadly weapon at close range are circumstances that support a finding of specific intent to kill. State v. Broaden, 99-2124 at p. 18, 780 So.2d at 362.
Byrd testified at trial that the defendant fired the weapon directly at him while standing only a short distance away. Regardless of whether any of the shots fired by the defendant actually hit Byrd, it is well settled that "[a] specific intent to kill or inflict great bodily harm can be inferred from a shooting which occurs at a fairly close range." State v. Cummings, 99-3000, p. 4 (La.App. 1st Cir.11/3/00), 771 So.2d 874, 876. We are satisfied that the evidence presented, viewed in the light most favorable to the prosecution, proved beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence, all of the elements of attempted second degree murder and the defendant's identity as the perpetrator of that offense. Thus, for the additional reason that there was sufficient evidence to convict the defendant of the originally charged offense of attempted second degree murder, the jury's verdict of guilty of the responsive offense of aggravated battery in this case does not entitle the defendant to a reversal of her conviction. This assignment of error lacks merit.

PATENT ERROR
As mandated by La.C.Cr.P. art. 920(2), a patent error review has been made of the record in this case, and a patent sentencing error has been discovered. The defendant herein was convicted of manslaughter, a violation of La. R.S. 14:31, and aggravated battery, a violation of La. R.S. 14:34. The manslaughter statute provides for a sentence of not more than forty years of imprisonment at hard labor. The aggravated battery statute provides for a sentence of imprisonment, with or without hard labor, for not more than ten years, a fine of not more than five thousand dollars, or both. Neither statute authorizes the trial judge to impose any part of the sentence without benefit of parole. Nevertheless, the minutes contained in the record before us reflect that the trial judge ordered that both sentences be served without benefit of parole. Thus, it is clear from the record that the trial judge deviated from the statutory penalties provided for these offenses and gave the defendant an illegally severe sentence. We note that neither the defendant nor the state has raised this issue on appeal. However, in accordance with the provisions of La.C.Cr.P. art. 882(A), we amend the sentences to delete the provision "without benefit of parole." This matter is remanded to the trial court with instructions to correct the minutes to reflect this amendment to the sentences.
For the foregoing reasons, the defendant's convictions are affirmed. The sentences are amended, and as amended, they are affirmed, and the case is remanded to with instructions.
CONVICTIONS AFFIRMED. SENTENCES AMENDED AND AS AMENDED, AFFIRMED. REMANDED WITH INSTRUCTIONS.
HUGHES, J., concurs.