HUGHES, J.
|gThe defendant, Albert J. Marrero, Jr.,[1] was charged by bill of information with aggravated incest, a violation of LSA-R.S. 14:78.1. The defendant entered a plea of not guilty, was tried before a jury, and was found guilty of the responsive offense of attempted aggravated incest, in violation of LSA-R.S. 14:27 and LSA-R.S. 14:78.1. The trial court denied the defendant’s motion for new trial and sentenced the defendant to five years imprisonment at hard labor. The defendant now appeals, assigning as error that the evidence is insufficient to support the verdict, and that his trial counsel was ineffective. For the following reasons, we affirm the conviction and sentence.
FACTS
According to the victim, M.A.L.,[2] her relationship with the defendant (her stepfather) became sexual when she was thirteen years of age and her mother was pregnant. The victim specifically indicated that the sexual nature of their relationship began with a game called “chicken,” wherein the victim would be considered a chicken if she did not acquiesce in certain conduct. The first time the defendant suggested that the victim play the game with him, he kissed her cheek, neck, and lips before she cried out “chicken.” During the next incident, the defendant kissed the victim and rubbed the lower part of her thigh before she cried out “chicken.” Approximately two weeks later, during a third incident, the defendant started rubbing the victim’s thighs and proceeded to place his hands in her pants, over her underwear. Ultimately the defendant began sleeping in the same Lbed with the victim, placing his hands in her underwear, and rubbing her vagina. The victim stated that this would happen on weeknights and continued until she reached the age of eighteen. The victim stated that during one of the occasions when the defendant was sleeping in the same bed with her, he performed oral sex on her. The victim further indicated that, on occasion, she also performed oral sex on the defendant. The victim reported the incidents on January 4, 2010 and a police investigation ensued.
ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error, the defendant argues that the evidence was insufficient to support the conviction of attempted aggravated incest. The defendant notes that the victim was angry when he and her mother had their first child together. The defendant also detailed the victim’s allegations, and while noting his admission that there was one inappropriate kiss, he further notes his denial of the victim’s claim that he took a week off from *25 work to spend time with her while her mother was out of town for church. In this regard the defendant notes that he testified that he could never have afforded to take a week off from work. The defendant notes that the victim admitted to sending him and her mother birthday and anniversary cards after she moved out, specifying a birthday card that she sent entitled, “Happy Birthday To A Loving Dad.” Further, the defendant notes that the anniversary card she sent to them included the following handwritten note, “You made it 10 whole years. I love yc’]all both so much and hope that one day I can be happily married for 10 years to someone wonderful.” The defendant concludes that no reasonable jury could have found him guilty of attempted aggravated incest.
In reviewing the sufficiency of the evidence to support a conviction, a Louisiana appellate court is controlled by the standard enunciated by the |4United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Jackson standard of review, incorporated in LSA-C.Cr.P. art. 821(B), is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime beyond a reasonable doubt. State v. Ordodi, 2006-0207, p. 10 (La.11/29/06), 946 So.2d 654, 660. The Jackson standard is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. Patomo, 2001-2585, p. 5 (La.App. 1 Cir. 6/21/02), 822 So.2d 141, 144. The factfinder weighs the respective credibilities of the witnesses, and an appellate court will generally not second-guess those determinations. State v. Ordodi, 2006-0207 at p. 10, 946 So.2d at 660 (citing State v. Dabney, 2002-0934, p. 1 (La.4/9/03), 842 So.2d 326, 327; State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983)).
Herein the defendant was convicted of attempted aggravated incest. Louisiana Revised Statute 14:78.1, the aggravated incest statute, provides in pertinent part:
A. Aggravated incest is the engaging in any prohibited act enumerated in Subsection B with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child, grandchild of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece.
B. The following are prohibited acts under this Section:
(1) Sexual intercourse ... carnal knowledge of a juvenile, indecent behavior with juveniles ... molestation of a juvenile ... or any other involvement of a child in sexual activity constituting a crime under the laws of this state.
|k(2) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both.
Felony carnal knowledge of a juvenile is committed when a person who is seventeen years of age or older has sexual intercourse, with consent, with a person who is thirteen years of age or older but less than seventeen years of age, when the victim is not the spouse of the offender and when the difference between the age of the victim and the age of the offender is four years or greater. LSA-R.S. 14:80(A)(1). Sexual intercourse means anal, oral, or vaginal sexual intercourse. LSA-R.S. 14:80(B). Indecent behavior with juveniles *26 is, in pertinent part, the commission of any lewd or lascivious act upon the person of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person. LSA-R.S. 14:81(A)(1). Such an act constitutes molestation of a juvenile, in pertinent part, if committed by the use of influence by virtue of a position of control or supervision over the juvenile. LSA-R.S. 14:81.2(A)(1). Under LSA-R.S. 14:27(A), a person is guilty of an attempt to commit an offense when he has a specific intent to commit a crime and “does or omits an act for the purpose of and tending directly toward the accomplishing of his object.” Thus, to support a conviction for attempted aggravated incest, the State is required to prove that the defendant specifically intended to engage in an act listed in Subsection B of LSA-R.S. 14:78.1 with his stepdaughter. Such proof is indispensable, as specific intent to accomplish the offense is the sine qua non of the criminal offense of attempt. Specific intent is a state of mind and as such need not be proven as a fact, but may be inferred from | c,the circumstances and actions of the accused. State v. James, 2002-2079, p. 4 (La.App. 1 Cir. 5/9/03), 849 So.2d 574, 579.
At the time of the trial on March 24, 2011, the victim was twenty years old. The victim was between the ages of thirteen and eighteen when the acts that formed the basis of defendant’s conviction occurred. The incidents occurred when the defendant and the victim were alone, the victim specifically stating that her mother would be in the bedroom asleep or in the shower and her siblings would be asleep. The victim also stated that the incidents would occur when her grandfather, who often stayed in the home with them, visited other relatives. The victim testified that the defendant touched her thighs, legs, “boobs,” neck, vagina, and butt on countless occasions and performed oral sex on her six or seven times. The incidents began to occur on Monday nights when the victim and the defendant would watch football together in the living room. The victim further testified that while the incidents initially occurred once a week, once the defendant began sleeping in the same bed with her, they would occur on a nightly basis.
The frequency of incidents decreased by the time the victim was sixteen and seventeen years of age, slowing down to about one to three times a month. The victim stated that only two incidents occurred after she turned eighteen years old. The victim stated that the defendant did not allow her to have boyfriends, and she was not allowed to go on dates or attend parties without the defendant’s supervision. The victim also stated that she was homes-chooled (according to subsequent testimony, she had a learning disability, dyslexia) and would be questioned by the defendant regarding her whereabouts if she left the home. According to the victim, the defendant treated her like she was his wife or girlfriend when her mother was not present. The victim further stated that she did not report the incidents to her |7mother because she was afraid her mother would not believe her or would abandon her, adding that, as she feared, both occurred when she finally disclosed the incidents.
The victim had more freedom when she visited her biological father and stepmother. The victim finally refused to return to the defendant’s home during a visit with her aunt, K.M. (whose testimony as a State rebuttal witness will be further discussed hereafter). The victim told the defendant that she was not going to leave her aunt’s home to go back to the defendant’s home and he became hysterical and started crying. K.M. recalled this conversation *27 and noted that the telephone was on speakerphone and the defendant was “really upset, crying ... and ... saying, ‘Why are you doing this to me and your mom and the kids? I don’t understand why you don’t love us anymore.’ ” K.M. thought the defendant’s reaction was strange. The victim continued to communicate with her mother and the defendant and admitted that she sent them cards, stating that she cared for them, especially her mother and three younger siblings and wanted to keep peace between them. However, the victim came forward because she was concerned about her younger sisters and did not want this to happen to anyone else.
During cross-examination, the victim admitted that she was upset because the defendant and her mother did not allow her to date during her teenage years. She finally had a male friend when she was seventeen years old, although it was forbidden by the defendant and her mother, and the same individual became her boyfriend after she moved out of her mother and the defendant’s home at the age of eighteen. The victim admitted she was angry when the defendant and her mother got married and to being initially upset when her mother began having children with the defendant. The victim denied lying or fabricating the alleged incidents.
|sThe defendant’s other stepdaughter, M.A. (who was fifteen years old at the time of the trial), testified that certain behavior of the defendant caused her to be concerned when she was about twelve or thirteen years of age, stating: “When my mother would go take a shower, occasionally my stepfather, [the defendant], would either come to my — mine and my sister’s bedroom and get under the covers with her, or she would, to my knowledge, go to his bedroom. And as my mom got out of the shower, they would go back to their own rooms.” She further testified that she often saw the defendant pat the victim on her butt, more often than he would do so to their mother. According to her testimony, the defendant also patted her on the butt a few times, but she asked him to stop doing so because she felt it was inappropriate and he complied.
K.M. (the victim’s aunt referenced above), testified that she noticed that the victim and the defendant had a physically and emotionally close relationship as the victim was growing up. She specifically stated that they would sit close together, and the defendant’s arms would often be around the victim. She also noticed that the defendant would often slap the victim’s bottom as they passed each other, and she recalled an incident when the victim was “straddling” the defendant’s lap as his arms were positioned around her waist. These observations took place when the victim was physically developed and between the ages of thirteen and seventeen years old. K.M. stated that the behavior made her feel uncomfortable. K.M. also noted that the victim did not have a social life outside of the church. On cross-examination, K.M. admitted to accusing her father’s friend of molesting her. Her father did not believe her and the allegation was not investigated.
|90n January 4, 2010 Sergeant Vincent Liberto, Jr., interviewed the defendant regarding the victim’s allegations, and the defendant denied any inappropriate behavior. During a subsequent recorded interview, the defendant admitted to having a “physical relationship” with the victim that included horseplay, slap-fighting, pushing, and chest bumping before the victim began to develop. During one incident, described by the defendant, the victim “flopped” on top of him, as she had done on several occasions, and his other stepdaughter, M.A., jumped on top of the *28 victim. The defendant removed them without any inappropriate touching. The defendant stated that it was possible that over the years his hand may have touched the victim’s butt but not in the vagina or breast area. The defendant made several requests for his wife to be present to discuss the issue, stated that he wanted to speak to his attorney about certain things “without my wife,” and requested to speak to Sergeant Liberto on a later day.
Sergeant Liberto interviewed the defendant again on January 11, 2010. The defendant stated that the victim behaved flirtatiously with him over the years and that he did not think it was inappropriate although he admitted that most people would have, but added he and the victim felt comfortable with each other and the flirting. Specifically, the victim was very affectionate and often lounged physically close to the defendant. The defendant later stated that he did not flirt back with the victim.
The defendant discussed occasions when he helped the victim out of the bathtub because she had an injured knee at the time and his wife was pregnant, occasions when the victim did “lap-dance type stuff’ with him (including the victim “grinding” on his leg), incidents of the victim sitting on his lap in such a manner that he “could feel her body,” an incident when the victim had bitten or strongly kissed his neck, leaving a “hickie,” and stated | in“we kissed one time where it was inappropriate.” The victim was about fifteen years old on the occasions that the defendant helped her get out of the bathtub and on one of those occasions her towel fell and he saw her chest. The defendant stated that an inappropriate kiss occurred when his wife and stepdaughter, M.A., were out of town at a camp for a week that past August. The victim babysat the other children while he worked. Two nights before his wife came home, the defendant said that he and the victim were lying on his bed together (as they commonly did) watching a movie, and after the movie went off, they lay there, looked at each other, and kissed. The kiss led to “make-out kissing” for about a minute. The defendant stated that the victim pushed his shoulders down to try to get him to perform oral sex and when he refused, she suggested that he was “chicken.” The defendant denied ever playing a game called “chicken” with the victim before this incident.
Before the interview, the defendant told the victim’s mother, T.M. (his wife), about the kissing/making-out incident. T.M. was upset and stated that she knew she should not have left them alone. The defendant stated that the victim and her biological father made accusations in order to “get back at me,” because the victim liked him as more than a stepfather and he rejected her and because she blamed him when the relationship with her boyfriend ended.
The defendant testified that he did not sleep in the same bed with the victim when she was thirteen years old, but admitted to sleeping in the bedroom with the children when he and T.M. had a newborn. The defendant testified that the only occasion when anything inappropriate occurred was when the victim was eighteen years old and they kissed (in August of 2009) after watching a movie in bed. The defendant also testified that the victim lulled about not having boyfriends or not being allowed to have friends. The defendant stated that the victim began flirting with him after she moved out of the home (within a year and six months of the trial) and would return to babysit. The defendant indicated that the victim admittedly was angry about her mother building a family with the defendant and was a very jealous, selfish, and attention-seeking person. During *29 cross-examination, the defendant denied ever being in the victim’s bed with her,
T.M., still married to the defendant at the time of the trial, testified as a defense witness. T.M. stated the victim thought that she and the defendant were too strict. T.M. stated that the defendant would occasionally sleep in the bedroom that four of her five children shared, including the victim, but added that there were several beds in the room and the defendant slept in one of them alone. The victim was temporarily given her own bedroom when she was fourteen years old. The victim never told her that the defendant molested her before she made allegations on January 4, 2010. T.M. stated that when the victim made the disclosure to her it sounded like a speech, which began with the statement: “When I was 13, Albert James Marrero molested me.” T.M. stated she believed the victim blamed the defendant for her (T.M.’s) divorce from the victim’s biological father. T.M. stated that she and the defendant remained together after he disclosed the inappropriate kiss, and they became estranged from the victim.
The victim’s maternal grandfather, D.H., also testified as a defense witness. D.H. lived in the defendant’s home for about an eight-week period after Hurricane Katrina. During that period, D.H. slept in the living room on the couch, the defendant and the children slept in a bedroom that had been converted from a porch of the house, and T.M., who was toward the end of her pregnancy at the time, slept in the bedroom. D.H. testified that the | )2windows and door were kept open to the bedroom (a converted porch), and he never heard or saw anything inappropriate while he lived there. During cross-examination, D.H. admitted that he would not have known what was occurring while he was sleeping.
As the trier of fact, a jury is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact’s determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder’s determination of guilt. State v. Taylor, 97-2261, p. 6 (La.App. 1 Cir. 9/25/98), 721 So.2d 929, 932. An appellate court is constitutionally precluded from acting as a “thirteenth juror” in assessing what weight to give evidence in criminal cases; that determination rests solely on the sound discretion of the trier of fact. The fact that the record contains evidence that conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Azema, 633 So.2d 723, 727 (La.App. 1 Cir.1993), writ denied. 94-0141 (La.4/29/94), 637 So.2d 460. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La.1984).
The testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the |1soffense. State v. James, 2002-2079 at p. 8, 849 So.2d at 581. The victim clearly described acts that included oral sexual intercourse and other lewd or lascivious acts that the defendant committed when she was under the age of seventeen. There was an age difference of greater than four years between the victim and the *30 defendant and the acts were clearly made with the intention of arousing or gratifying the sexual desires of either person.[3] Further the acts were committed by the use of influence by virtue of a position of control or supervision over the juvenile. Moreover, in this case the defendant himself and other family members divulged relevant information regarding the behavior and nature of the relationship between the defendant and the victim. The jury accepted the victim’s testimony as credible and rejected the defendant’s hypothesis of innocence that the victim falsified the claims because she resented the relationship between the defendant and her mother. In reviewing the evidence, we cannot say that the jury’s determination was irrational under the facts and circumstances presented to them. See State v. Ordodi, 2006-0207 at p. 14, 946 So.2d at 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway, 2007-2306, pp. 1-2 (La.1/21/09), 1 So.3d 417, 418. (per curiam). We are convinced that, | ,4viewing the evidence in the light most favorable to the prosecution, the record beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence supports the trier of fact’s verdict of attempted aggravated incest. Assignment of error number one lacks merit.
ASSIGNMENTS OF ERROR NUMBERS TWO, THREE, AND FOUR
In his second assignment of error, the defendant contends that he was denied due process and effective assistance of counsel by the failure of his trial counsel to file a motion to quash or a bill of particulars requesting clarification of the underlying act or crime for which he was charged. The defendant argues that the State failed to provide notice of what act or crime enumerated in LSA-R.S. 14:78.1(B) he was charged with committing, thus impeding his ability to defend against the charge and further provide protection against double jeopardy for any future charges. The defendant further argues that the trial counsel’s failure to seek such notice was not trial strategy. The defendant concludes that he was clearly prejudiced by the defense counsel’s failure to object to the State’s failure to specify which portion of the statute they were alleging he violated and further by having the statute in its entirety read and considered by the jury.
In his third assignment of error, the defendant contends that he was denied due process and effective assistance of counsel by the failure of his trial counsel to object to the trial court’s application of the LSA-C.E. art. 511 clergyman’s privilege, to prohibit the defense from offering testimony *31 of clergyman Bryon Brown to impeach the credibility of the victim. The defendant concedes that Brown was a clergyman. The defendant notes that the victim asked Brown to allow her to teach a class to impart information to other young people about the avoidance of improper sexual relations before marriage. The defendant argues that the testimony should not have been | ^excluded based on privilege since the victim in this case was not seeking spiritual advice or consolation at the time of the communication in question. The defendant further argues that the information relayed by the victim was not intended to remain private, thus any existing privilege was waived. The defendant concludes that because the case involved the lone testimony of one victim, with very little corroborating evidence, impeaching her credibility likely would have resulted in a different outcome at trial. The defendant also notes that the jury chose the responsive verdict of attempted aggravated incest and argues that this indicates that the jury had some doubt as to the credibility of the victim’s testimony.
Finally, in his fourth assignment of error, the defendant argues that he was denied due process and effective assistance of counsel by the failure of his trial counsel to object to an improper, unfounded line of questioning by the prosecutor regarding the defendant seeking counseling for an addiction to pornography. The defendant argues that the questioning at issue was improperly suggestive and such counseling through the church would have been privileged information. The defendant notes that after he denied seeking any counseling for a pornography addiction or having any knowledge of anything related to the line of inquiry, the State did not call any witness to rebut his denial. The defendant contends that the line of questioning was solely to allude to a pornography addiction and instill prejudice in the minds of the jury. The defendant concludes that the trial counsel’s failure to object and request a mistrial and/or admonition was ineffective.
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for postconviction relief in the trial court rather than on appeal. This is because postconviction relief provides the | ^opportunity for a full evidentiary hearing under LSA-C.Cr.P. art. 930.[4] However, when the record is sufficient, this court may resolve this issue on direct appeal in the interest of judicial economy. State v. Patton, 2010-1841, p. 8 (La.App. 1 Cir. 6/10/11), 68 So.Sd 1209, 1217; State v. Lockhart, 629 So.2d 1195, 1207 (La.App. 1 Cir.1993), writ denied, 94-0050 (La.4/7/94), 635 So.2d 1132.
The claim of ineffective assistance of counsel is to be assessed by the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The defendant must show that his counsel’s performance was deficient and that the deficiency prejudiced him. A counsel’s performance is deficient when it can be shown that he made errors so serious that he was not functioning as the “counsel” guaranteed to the defendant by the Sixth Amendment. A counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. To carry his burden, the defendant must show that there is a reasonable probability that, but for coun *32 sel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. State v. Patton, 2010-1841 at pp. 8-9, 68 So.3d at 1217 (quoting Strickland v. Washington, 104 S.Ct. at 2064 and 2068).

^¡Counsel’s Failure to File a Motion to Quash or Request Clarification in the Bill of Particulars

The bill of information in this case states that the defendant committed the offense of aggravated incest from January 31, 2004 to January 13, 2009 by engaging in any prohibited act enumerated in Subsection B of LSA-R.S. 14:78.1 with a person who is known to the offender to be related as defined in the statute. As noted by the defendant, his trial counsel did not file a motion to quash the bill of information.
An accused shall be informed of the nature and cause of the accusation against him. LSA-Const. art. I, § 13. That requirement is implemented by LSA-C.Cr.P. art. 464, which provides:
The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
A defendant may not complain of technical insufficiency in a bill of information for the first time after conviction, when the indictment fairly informed the accused of the charge against him and the defendant is not prejudiced by the defect. After the verdict, a defendant ordinarily cannot complain of the insufficiency of a bill of information unless it is so defective that it does not set forth an identifiable offense against the laws of this State and inform the defendant of the statutory basis of the offense. See State v. Templet, 2005-2623 (La.App. 1 Cir. 8/16/06), 943 So.2d 412, 420, writ denied, 2006-2203 (La.4/20/07), 954 So.2d 158. Omission of the essential facts from a bill of information is not necessarily prejudicial error because such facts can be given through responses in a bill of particulars. State v. Authement, 532 So.2d 869, 873 (La.App. 1 Cir.1988).
|isln this case, the defense counsel filed an application for a bill of particulars that in part requested the date, time, and location of the alleged offense, evidence seized, a copy of the arrest warrant, statements, names and addresses of witnesses, and a description of any and all evidence or information the State has in its possession that would tend to exculpate or help the defendant in preparation of his defense. The State’s discovery answer noted “open file” discovery of all evidence would be provided and that a courtesy copy of file materials had been provided to defense counsel.
Based on the foregoing, the defendant has failed to show that he was unaware of the allegations against him, or how he was prejudiced by the language or lack of specificity in the bill of information or by the reading of the statute in its entirety to the jury. Thus, even assuming any deficiency in trial counsel’s failure to file a motion to quash or request specificity in the bill of particulars regarding the nature of the charge, the defendant has failed to show how he was prejudiced in this regard. Thus we find no merit in the ineffective assistance of counsel claim raised in assignment of error number two.

*33
Clergyman’s Privilege

The clergyman privilege of LSA-C.E. art. 511 applies if all of the following requirements are shown to exist: (1) it must be determined that the person to whom the communication was received is a “clergyman;” (2) it must be determined that the purpose of the communication was to seek spiritual advice or consolation; (3) it must be determined that the communication was made privately and was not intended for further disclosure, except to other persons present in furtherance of the purpose of the communication; and (4) even if those explicit requirements of the article are met, it must also be determined whether or not the communicant waived 119the application of the privilege. Whether the prerequisites to the recognition of the privilege are present is a determination to be made by the trial judge under LSA-C.E. art. 104(A).[5] In making this determination, the trial court considers whether the totality of the circumstances presented indicates that the statements made are within the communications protected by the privilege. See State v. Gray, 2004-1197, pp. 6 and 11 (La.1/19/05), 891 So.2d 1260, 1264 and 1267.
Before opening statements in this case, the trial court had a hearing on the LSA-C.E. art. 511 issue in this case as the State orally sought to exercise the clergyman’s privilege on behalf of the victim. The defense attorney called Minister Byron Brown to the witness stand. The victim and her family were members of the minister’s church. Minister Brown confirmed that his church provided different types of “purity” classes. When the victim was seventeen years old she went to the minister’s office and asked to speak to him. She expressed her desire to teach young girls to stay pure and to be a virgin, as she had been able to fulfill such purity. On cross-examination, Minister Brown explained that the church did not allow the victim to teach the class because they did not feel she was mature enough to do so at the time. Minister Brown stated that he ministered and counseled the victim as a pastor and counselor. The prosecutor further asked, “And the counseling session is what you’re talking about about this purity issue, right?” Minister Brown replied, “That’s only one of the instances.” Minister Brown subsequently confirmed that when the victim came to him to talk about the |gnPurity class he was counseling her. During the session, the victim stated that she was a virgin. The office door was closed at the time. The trial court ruled that the clergyman’s privilege was applicable to the communication at issue and the defense counsel did not object to the ruling.
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. LSA-C.Cr.P. art. 841. See also LSA-C.E. art. 103(A)(1). Thus, by failing to object to the trial court’s ruling, the defense counsel did not properly preserve this issue for appeal. See State v. Simms, 381 So.2d 472, 476-77 (La.1980); State v. Richmond, 464 So.2d 430, 436 (La.App. 1 Cir.), writ denied, 467 So.2d 535 (La.1985). Nonetheless, if the substantive issue an attorney failed to raise has no merit, then the claim the *34 attorney was ineffective for failing to raise the issue also has no merit. State ex rel. Roper v. Cain, 99-2173, p. 6 (La.App. 1 Cir. 10/26/99), 763 So.2d 1, 5 (per curiam), writ denied. 2000-0975 (La.11/17/00), 773 So.2d 733. In finding that the clergyman’s privilege was applicable, the trial court noted that the victim and Minister Brown were in his office at the time of the communication, one-on-one, and he was acting as her minister and counselor. The court further noted that the substance of the meeting was not relevant since the victim still could have considered herself a virgin notwithstanding the allegations in the instant case. The trial court further noted that there was no indication that the communication was intended for public disclosure. We find that the trial court’s ruling was supported by the testimony presented at the hearing and by the totality of the circumstances. Thus we find no abuse of discretion in the trial court’s finding that the clergyman’s privilege was applicable to the communication at issue, and the defendant was not prejudiced by counsel’s failure to object, 12i since any objection would properly have been sustained. Based on the foregoing, assignment of error number three lacks merit.

Propriety of Prosecutorial Questioning Regarding Defendant’s Purported Counseling for Pornography Addiction

During the State’s cross-examination of the defendant, the following colloquy took place:
Q. Did you attend Bible school at the Madisonville church?
A. Yes, occasionally.
Q. Did that church ever address addiction?
A. Not that I remember.
Q. Do you recall attending Bible study that addressed addictions, which included addictions to pornography?
A. Not that I know of.
Q. You do not recall that?
A. I don’t recall it, no.
Q. Do you recall your wife [T.M.] telling anyone that you were pleased with the fact that it dealt with addiction to pornography?
A. That what dealt with it?
Q. That the Bible study classes at your church dealt with addictions to pornography.
A. I don’t have any idea what you’re talking about right now, that I can remember.
Q. So in your opinion, there would be no reason for [T.M.] to tell anybody else that she was pleased that you were battling your addiction to porn by attending these Bible classes?
A. No, not that I know of. I don’t have any idea what you’re talking about.
As noted by the defendant on appeal, the defense counsel did not object to the above colloquy or move for a mistrial or an admonition.
| ¡¾/Fhe defense counsel’s failure to make a contemporaneous objection or to request a mistrial or an admonition in the trial court results in a waiver of this issue on appeal. LSA-C.E. art. 103(A)(1); LSA-C.Cr.P. art. 841. However, we will address the issue in the context of the defendant’s ineffective assistance of counsel claim in this regard.
It is a grave injustice for a district attorney to propound improper questions, containing prejudicial suggestions or insinuations, without serious intention of having the questions answered, but for the purpose of having the questions make their unfavorable impression and have their prejudicial effect upon the mind of the jury. State v. Moms, 404 So.2d 1186, 1189 (La.1981). Upon motion of a *35 defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by LSA-C.Cr.P. arts. 770 or 771. LSA-C.Cr.P. art. 775. The determination as to whether or not a mistrial should be granted under LSA-C.Cr.P. art. 775 is within the sound discretion of the trial court, and a denial of a motion for mistrial will not be disturbed on appeal absent an abuse of discretion. State v. Young, 569 So.2d 570, 583 (La.App. 1 Cir.1990), writ denied, 575 So.2d 386 (La.1991). A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to the defendant, depriving him of a reasonable expectation of a fair trial. State v. Fisher, 95-0430, p. 7 (La.App. 1 Cir. 5/10/96), 673 So.2d 721, 725-26, writ denied. 96-1412 (La.11/1/96), 681 So.2d 1259. See also State v. Wingo, 457 So.2d 1159, 1166 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985).
12,/Uie remarks at issue clearly did not warrant a mandatory mistrial pursuant to LSA-C.Cr.P. art. 770.[6] Louisiana Code of Criminal Procedure Article 771 reads, in pertinent part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770;
* ⅜ ⅜
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
Even if we assume, arguendo, that the trial counsel’s failure to object to the line of questioning, or request an admonition, or move for a mistrial constituted deficient performance, the defendant is, nonetheless, required to show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. Specifically, the defendant must show that, but for trial counsel’s failure to object to the above-quoted line of questioning there is a reasonable probability that he would not have been found guilty of attempted [^aggravated incest. See Strickland v. Washington, 466 U.S. at 694, 104 S.Ct. at 2068.
It was wrong for the prosecutor to ask the question without proof. In United States v. Pugliese, 153 F.2d 497 (1945), Judge Learned Hand ruled that it was *36 proper to call an opposing lawyer to the stand and cross-examine him after he had asked a witness if she had been hospitalized for mental problems and then offered no proof of this when the witness denied it.
However, the line of questioning at issue was brief, and the defendant denied any attempt by the State to link him to pornography addiction. When viewed in the context of the substantial weight of the evidence against the defendant, noted in the discussion of the defendant’s first assignment of error, we conclude there is no reasonable probability that 'the jury would have returned a different verdict, had the defense counsel contemporaneously objected to the State’s line of questioning. Further, under our adversary system, once a defendant has the assistance of counsel, the vast array of trial decisions, strategic and tactical, that must be made before and during trial rests with an accused and his attorney. State v. Patton, 2010-1841 at p. 10, 68 So.3d at 1218 (quoting State v. Folse, 623 So.2d 59, 71 (La.App. 1 Cir.1993)). Once the State began the line of questioning, the issue was already before the jury, regardless of any subsequent objection, and an objection or admonishment would have drawn additional attention to the matter. The defense counsel may have determined, as a part of trial strategy, that calling attention to the issue by objecting or asking for an admonition was not in the defendant’s best interests. Defense counsel may have chosen not to “ring the bell twice.” Thus, the defense counsel’s failure to object could be considered trial strategy. The investigation of strategy decisions requires an evi-dentiary | shearing and, therefore, cannot possibly be reviewed on appeal. State v. McMillan, 2009-2094, p. 14 (La.App. 1 Cir. 7/1/10), 43 So.3d 297, 307, writ denied, 2010-1779 (La.2/4/11), 57 So.3d 309. Based on the foregoing, we cannot say that the defense counsel was ineffective in failing to object to the above testimony or move for a mistrial or admonition in this regard. We find no merit in the fourth assignment of error.
CONVICTION AND SENTENCE AFFIRMED.

. Herein, we reference the victim and her family members, excluding the defendant, by use of initials. See LSA-R.S. 46:1844(W).

. According to the victim, the offenses took place between the years of 2004 and 2009.

. The bill of information listed the defendant's date of birth as May 8, 1970, which would have made his age, during the time period at issue (between 2004 and 2009), between thirty-four and thirty-nine years old, a difference of more than four years from the victim’s age (which was between thirteen and eighteen during the same time period). Although portions of the bill of information relative to the charges against the defendant were read to the jury, the statement of the defendant's date of birth was not read. The record does not disclose that the jury was presented with any direct evidence of the defendant’s age. However, we note that the defendant’s wife, T.M., stated in her testimony that she had been married to the defendant for fourteen years. Since the victim testified that she was twenty years old on the date of trial (March 24, 2011), the jury could have concluded that the victim was approximately six years old when her mother married the defendant, and therefore, the defendant had to have been more than four years older than the defendant.

. The defendant would have to satisfy the requirements of LSA-C.Cr.P. art. 924 et seq., to receive such a hearing. See State v. Patton, 2010-1841, p. 8 n. 5 (La.App. 1 Cir. 6/10/11), 68 So.3d 1209, 1217 n. 5.

. Louisiana Code of Evidence Article 104(A) provides:
Questions of admissibility generally. Preliminary questions concerning the competency or qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of Paragraph B. In making its determination it is not bound by the rules of evidence except those with respect to privileges.

. Louisiana Code of Criminal Procedure Article 770 states, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1)Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.