**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**19-702**

**STATE OF LOUISIANA**

**VERSUS**

**ISAME HENRY FACIANE**

**A/K/A ISAME FACIANCE**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 160998
HONORABLE DAVID M. SMITH, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Van H. Kyzar, and
Jonathan W. Perry, Judges.

**AFFIRMED.**

**Edward K. Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Isame Henry Faciane**

**Honorable Keith A. Stutes**
**District Attorney**
**Kenneth P. Hebert**
**Assistant District Attorney**
**Fifteenth Judicial District**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**KYZAR, Judge.**

The defendant, Isame Henry Faciane, appeals his convictions and sentences on five counts of aggravated crime against nature. For the reasons that follow, we affirm both his convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

Defendant was charged by bill of information with five counts of aggravated crime against nature, violations of La.R.S. 14:89.1(A)(2). He was charged for having sexual intercourse with his stepdaughter, C.F.,[1] over a three-and-one-half-year period. The victim was fourteen years old when the offenses began.

During a three-day trial, the jury heard the testimony from C.F., who testified that Defendant, her stepfather, began having sexual intercourse with her beginning in the summer of 2013, when she was fourteen years of age, and continuing until after she reached eighteen years of age. Pastor Adam Leday, Executive Associate Pastor of Refuge Temple Ministries, Inc. (Refuge Temple), testified that in April 2017, C.F. told him that Defendant had been having sex with her since she was fourteen years old, continuing until about two weeks before their meeting. He agreed to meet with C.F. and her mother the following day so that C.F. could tell her mother, who was unaware of the situation. He stated that he and the senior pastor of the church met with C.F. and her mother, and that Defendant was outside the room during the meeting. Although the door to the room was closed, he stated that he could hear Defendant saying, "That's not true. That's not true." Thereafter, Pastor Leday testified that Defendant wanted to tell his side of the story and did so in the pastor's office out of the presence of his wife and C.F. He stated that Defendant admitted to having a sexual relation with C.F., but only after she turned eighteen

---

[1] In accordance with La.R.S. 46:1844(W), the victim's initials are used to protect her identity.

years of age. C.F.'s mother testified and confirmed the meeting with C.F. and Pastor Leday. Detective Robert White, of the Lafayette Police Department, testified that on April 13, 2017, he took a recorded video statement of Defendant after he was advised of and waived his *Miranda*[2] rights. In the video statement, Defendant admitted to engaging in sexual intercourse with C.F. when she was seventeen and eighteen years of age, but he denied earlier contact.

Prior to trial, Defendant filed a motion in limine objecting to the testimony of Pastor Leday on the ground that his testimony would violate the privilege afforded communications to clergymen as set forth in La.Code Evid. art. 511. At the conclusion of the hearing the trial court denied the motion, permitting the introduction of Pastor Leday's testimony.

On December 11, 2018, a jury found Defendant guilty of all five counts. He was sentenced on May 22, 2019, to fifteen years at hard labor on each count, the sentences to run concurrently with each other. He then filed a motion for appeal, which was granted on July 18, 2019. In his appeal, Defendant raises two assignments of error. In his first assignment of error, he argues that the trial court erred in denying his motion in limine and allowing into evidence the testimony of Pastor Leday at trial. In his second assignment of error, he argues that the trial court erred in imposing excessive sentences. For the following reasons, we find these assignments of error lack merit.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

2

## OPINION

### *Assignment or Error Number One:  Clergyman Privilege*

Defendant first asserts that the trial court erred in denying his motion in limine wherein he urged that Pastor Leday's testimony, concerning the conversation between them, should have been excluded as a privileged communication to a clergyman.  In the motion in limine, Defendant alleged that the statements he communicated to his pastor were made in a private setting and were made for the sole purpose of spiritual counseling.  After a hearing, the trial court denied Defendant's motion and admitted the statements through Pastor Leday's testimony.  We find there was no error in the trial court's admission of these statements.

Defendant argues the trial court erroneously admitted his statement to Pastor Leday as he had an expectation of privacy when meeting with the clergyman in charge of his spiritual counseling.  Had the statements to Pastor Leday been excluded, Defendant argues that the jury potentially could have rejected his recorded confession taken by Detective White.

At the hearing on Defendant's motion in limine, Pastor Leday testified that as the Executive Associate Pastor of Refuge Temple he counsels families and provides spiritual guidance to the people in his parish.  Because he was assigned to families in his parish with a surname beginning in "F," Pastor Leday was assigned the task of counseling the Faciane family.  When asked if he provided counseling to the Faciane family, Pastor Leday replied, "From time to time."  Pastor Leday also remembered giving the Faciane family spiritual guidance.

Pastor Leday recounted having a meeting with Defendant at which the Senior Pastor of the church was also present.  He stated that the meeting took place in his office at church with the door closed.  When asked about his meeting with Defendant that day, Pastor Leday responded:

3

After the Senior Pastor, myself, Sederra, and [C.F.] met. The mother was very distraught. Isame passed by the office. He could hear what was going on. I did not want to bring him into the same room with that going on. The Senior Pastor and myself, as I explained, this is when we met in my office.

According to Pastor Leday, he did not counsel Defendant that day and did not give Defendant any advice. Pastor Leday simply listened to Defendant. Defendant revealed that he and his stepdaughter had been in a sexual relationship that he claimed had begun in the summer. Pastor Leday testified that Defendant was a deacon in the church.

When asked in what capacity he met with Defendant that day, Pastor Leday replied:

> He showed up at the church when we were talking with [C.F.] and her mother. He showed up. And his behavior, again, he was staying there for this, outside he was saying, "She's not telling the truth." He was possibly wanting to tell his side of the story.

Pastor Leday testified that he understood the conversation to be a private conversation between him and Defendant. However, he also stated that the meeting with Defendant was not scheduled, as he just showed up, and the meeting was not for purposes of counselling, but that Defendant wanted to tell his side of the story.

On cross-examination by the State, Pastor Leday testified that he is not a licensed therapist, but that he is licensed to provide counseling through his church. The following colloquy took place regarding the purpose of Pastor Leday's meeting with the victim and the victim's mother:

> Q. So, you guys weren't there to have her, you know, seek advice from you; it was just mediating between her and mom to kind of help the situation.
>
> A. That is correct.
>
> Q. And normally you would want to keep that private, right?
>
> A. That's correct.

4

Q.   All right. Is there anything that says you have to keep that private?

A.   No, sir.

Q.   Again, while this is going on, Isame is right outside?

A.   Yes.

Q.   And you testified that Isame was saying, "She's lying. She's not telling the truth. I want to tell my side of the story."

A.   Something of that sort, yes.

Q.   So, did he want to come in right there?

A.   I didn't hear him knock on the door. I could just hear him outside the door.

Q.   Okay. It was apparent to you that he wanted to refute what she said?

A.   Yes, sir.

     . . . .

Q.   What did Isame say when he first walked in?

A.   He wanted to know what [C.F.] had said.

Q.   So, he wanted to know what she said?

A.   Yes.

Q.   In your closed-door conversation?

A.   Yes.

Q.   Okay. And what did you say to him?

A.   I asked him would he like to talk. I mean - -

Q.   Okay. So you guys then had a conversation about what you had already testified to instead of having some - -

A.   That is correct.

Q.   At any point did Isame say: I'm just telling you this because I need to figure out how to move on with my life religiously?

A.   No, sir.

5

Q. At any point did he ask you: How do I come to terms with this so that I can seek peace in my heart?

A. No, sir.

Q. Did he ask you at any point for spiritual guidance in that conversation?

A. No, sir.

Q. It was purely about him telling his side of the story to you, correct?

A. Yes, sir.

On re-direct, defense counsel asked Pastor Leday how he starts giving spiritual advice to someone that comes to him with a problem. The following colloquy occurred:

A. After listening to their problem and if they're seeking counseling, I would give the counseling.

Q. So, when someone comes to you, you listen first?

A. Yes, sir.

Q. And in this case you listened when Isame came to you.

A. Yes, but it was not counseling.

After the introduction of Pastor Leday's testimony at the motion in limine hearing, the State asked the trial court to take judicial notice of Detective White's interview of Defendant based on the trial court's previous viewing of the interview. In particular, the State asked the trial court to take judicial notice of the "point in the interview where Mr. Faciane tells the detective that the statement he just gave Detective White was the same thing that he told the pastor." The trial court responded, "I'm aware. I remember that."

In denying the Defendant's motion in limine, the trial court, in its oral ruling, accepted the stipulation of the State that it did not contest that Pastor Leday met the definition of a clergyman for purposes of the application of the privilege. However,

6

the trial court determined that the communication between Defendant and Pastor Leday was not for the purpose of seeking spiritual advice or counsel. The trial court noted that Defendant was there at the church "only as a result of [C.F.] or him finding out that [C.F.] was actually there confronting or spilling the beans, so to speak[,]" nor did the trial court "get any indication that he was there to seek spiritual guidance." Thereafter, the trial court concluded that "factor number 2 [requirement that the conversation be for the purpose of seeking spiritual advice or consolation] under the totality of the circumstances was not met." In addition, the trial court determined that the Defendant's confession to law enforcement acted as a waiver of the privilege, stating "it was divulged subsequently after the pastor's meeting with the defendant, it was said over again to a public officer, a police officer, a member of a government body." Specifically, the court noted "if that doesn't constitute a waiver of the privilege in confessing about the facts of the case to this police officer, which were the same facts confessed to the pastor, I wouldn't know what else would be a more blatant waiver of the privilege."

The privilege applicable to communications to clergymen is provided in La.Code Evid. art. 511, as follows:

> **A. Definitions.** As used in this Article:
>
> (1) A "clergyman" is a minister, priest, rabbi, Christian Science practitioner, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.
>
> (2) A communication is "confidential" if it is made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.
>
> **B. General rule of privilege.** A person has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual adviser.
>
> **C. Who may claim the privilege.** The privilege may be claimed by the person or by his legal representative. The clergyman is presumed

7

to have authority to claim the privilege on behalf of the person or deceased person.

In *State v. Gray*, 04-1197, pp. 6-7 (La. 1/19/05), 891 So.2d 1260, 1264 (footnote omitted), the Louisiana Supreme Court stated the following regarding this privilege:

> Thus, there are three legal prerequisites to finding that the clergyman privilege applies. First, it must be determined that the person to whom the communication was received is a "clergyman." Second, it must be determined that the purpose of the communication was to seek spiritual advice or consolation. *See State v. Berry*, [324 So.2d 822 (La.1975), *cert. denied*, 425 U.S. 954, 96 S.Ct. 1731 (1976)]; *State v. Tart*, [93-772 (La. 2/9/96), 672 So.2d 116]. Third, it must be determined that the communication was made privately and was not intended for further disclosure except to other persons present in furtherance of the purpose of the communication. However, even if those explicit requirements of the article are met, it must also be determined whether or not the communicant waived the application of the privilege. *See* La. C.E. art. 502(A) ("A person upon whom the law confers a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter.")
>
> Whether the prerequisites to the recognition of the privilege are present is a determination to be made by the trial judge under La. C.E. art. 104(A). In making this determination, the trial court considers whether the totality of the circumstances presented indicate that the statements made by the defendant are within the communications protected by the privilege. *See State v. Tart*, 93-0772 (La.2/9/96), 672 So.2d 116; *State v. Berry*, 324 So.2d 822 (La.1975), *cert. denied*, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976). A trial court's ruling on a motion to suppress is subject to an abuse of discretion standard. *See State v. Hobley*, 98-2460 (La.12/15/99), 752 So.2d 771, 790.

La.Code Evid. art. 502 further provides that a privilege can be waived, stating in pertinent part as follows:

> **A. Waiver.** A person upon whom the law confers a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged.
>
> **B. Disclosure under compulsion or without opportunity to claim.** A claim of privilege is not defeated by a disclosure which was compelled or made without opportunity to claim the privilege.

8

Defendant argues the trial court erroneously admitted his statement to Pastor Leday as he had an expectation of privacy when meeting with the clergyman in charge of his spiritual counseling and that had the statement to Pastor Leday been excluded, the jury could have rejected the videotaped confession taken by Detective White. Although he assigns no error as to the admission of his interview with Detective White, Defendant asserts that the jury could have found the confession he made during the interview was the product of coercive and misleading interrogation techniques. Although acknowledging that Pastor Leday testified that he did not view his conversation with Defendant as one seeking counseling or spiritual guidance, Defendant contends it is his understanding of the nature of the conversation, not Pastor Leday's, that is the pertinent inquiry. Towards this end, Defendant urges that "there is no evidence in the record that Pastor Leday or his superior explained to Mr. Faciane that the purpose of their conversation was something other than spiritual guidance or counseling[,]" and because Pastor Leday had previously "counseled the Faciane/[][3] family on spiritual matters" and the conversation took place in a private room, the only purpose of the conversation was for "confessing his sins and seeking guidance as to how to act from that point on[.]"

Defendant also denies that he waived any privilege by subsequently confessing to Detective White. Emphasizing section B of La.Code Evid. art. 502, Defendant contends that nothing in the interview suggests that Detective White gave Defendant an opportunity to claim the privilege. Additionally, Defendant argues that since Pastor Leday had apparently already disclosed Defendant's confession to Detective White, Defendant's privilege had already been violated. Finally, Defendant argues that the trial court's erroneous admission of his statement to Pastor

---

[3] The name is omitted to further protect the identity of the victim.

9

Leday bolstered his videotaped confession to Detective White and deprived him of a fair trial.

The State concedes that the first requirement of La.Code Evid. art. 511 is satisfied since Pastor Leday meets the definition of a "clergyman." The State argues the second requirement, however, was not met since Defendant met with Pastor Leday solely to refute the victim's accusations and not to seek religious advice or spiritual guidance. According to the State, Pastor Leday made it clear at the motion in limine hearing that the purpose of his meeting with the Faciane family members was to mediate the situation with the family, not to offer advice, and that his meeting with Defendant was not to counsel but was at Defendant's behest to attempt to refute the allegations made by C.F.

The State further argues that the totality of the circumstances indicates Defendant never intended to keep his conversation with Pastor Leday private, asserting that Defendant "clearly met with the pastor and gave his side of the story in an effort to mitigate his exposure to the truth" and that it was "clear that it was to try and convince the pastor that he had not been doing these horrible things to C.F. since she was barely more than a child so that he would not have to worry about legal consequences." Finally, the State asserts Defendant waived the privilege by sharing the same information with Detective White after having been advised of his legal rights.

We find that the trial court did not abuse its discretion in finding Defendant failed to meet all the requirements of La.Code Evid. art. 511. Namely, Defendant failed to prove his statements to Pastor Leday were made for the purpose of spiritual advice or consolation. Defendant clearly sought an audience with Pastor Leday after the victim had already spoken to the pastor for the sole purpose of defending or minimizing the accusations against him. This was made clear from Pastor Leday's

10

testimony as well as Defendant's actions. In *State v. Berry*, 324 So.2d 822, 829 (La.1975), *cert. denied*, 425 U.S. 954, 96 S.Ct. 1731 (1976), the supreme court similarly found no error in a trial court's determination that the primary purpose of the defendant's statement to a minister was for a purpose other than seeking spiritual advice or consolation:

> The evidence was: The defendant came to the apartment to pawn a watch. After the minister's sister refused to loan him the money, he asked to speak to the minister. He then told the minister that he had gotten the watch from a girl he had killed and needed $8.00 or else he might hurt someone else. (The minister then loaned him $8.00 and took the watch, and subsequently turned it over to the police.)

> We are unable to find error in the trial court's factual appreciation that the primary purpose of this visit was not to seek spiritual advice or consolation, nor in its finding that, in the totality of circumstances presented (including that the communication was made in the presence of two other persons), the communication was not made within the requisite nature of a confidential disclosure for religious purposes of a penitent to a clergyman seeking religious consolation. 8 Wigmore on Evidence, Section 2396 (McNaughton Rev. 1961).

Likewise, this court finds no error in the trial court's factual determination that the primary purpose of Defendant's statement to Pastor Leday was for a reason other than spiritual guidance. The record supports the finding that Defendant's sole purpose was to refute the victim's accusation that the sexual intercourse started when she was fourteen years old. Since Defendant fails to prove this requirement of La.Code Evid. art. 511, it is not necessary to determine whether Defendant intended for the statement to be kept confidential or whether he waived any privilege by speaking with Detective White, as these questions are moot. All three prerequisites are required to be met before the clergyman privilege applies. *Gray*, 891 So.2d 1260. Further, we note that a harmless error analysis also applies to cases where a privilege may otherwise have been wrongly violated, but that such analysis is also moot by

11

our finding that no privilege applied to the conversation at hand between Pastor Leday and Defendant.[4] For these reasons, this assignment or error lacks merit.

## *Assignment of Error Number Two: Excessive Sentence*

Defendant next argues that the fifteen-year sentences imposed by the trial court on each of his convictions were excessive. Defendant was convicted of five counts of aggravated crime against nature committed against his stepdaughter over a period of approximately three-and-one-half years. The trial court sentenced Defendant to five concurrent sentences of fifteen years at hard labor. Since the penalty range for each offense was a fine of up to $50,000.00 and/or imprisonment with or without hard labor for five to twenty years, Defendant was exposed to a total fine of $250,000.00 and/or imprisonment with or without hard labor for 100 years. La.R.S. 14:89.1(C)(1). For the reasons discussed, we find the sentences imposed are not excessive.

Defendant first notes that prior to trial he turned down the State's offer for him to plead guilty to one count of felony carnal knowledge of a juvenile and receive a sentence of five years suspended and five years of probation. Defendant argues that the trial court's imposition of near maximum sentences implies vindictiveness, simply because he exercised his right to trial, and was excessive.

Defendant further asserts that his prior military experience and his religious experience were supported by evidence introduced at trial and prior to sentencing and are factors mitigating towards a lesser sentence. Although there was mention of some prior criminal history when he was a young man, Defendant contends his record is devoid of any specific criminal activity for an extended period prior to the instant case. Attempting to refute the State's argument of lack of remorse, Defendant

---

[4] *See State v. Green*, 493 So.2d 1178 (La.1986)

12

argues that if he felt no remorse for his sins, he would not have "bared his soul to his spiritual advisor." Although Defendant makes no argument that the trial court failed to provide specific reasons for the sentences imposed, he states that "without any apparent consideration of La.Code of Criminal Procedure Art. 894.1, the trial court imposed a sentence of 15 years at hard labor, just five years less than the maximum sentence." Finally, Defendant cites several cases wherein lesser sentences were imposed. We note, however, that none of the cited cases involved aggravated crime against nature.

The State argues that while Defendant asserts that the fifteen-year sentence is excessive as it is near the maximum sentence for aggravated crime against nature of twenty years, he completely ignores the fact that the trial court would have been within its discretion to run all of the counts consecutive to each other for a total of seventy-five years. Given that the potential maximum statutory sentence was one hundred years, when adding the maximum sentences for the five charges and running them consecutive, the State points out that Defendant was sentenced to only a fraction of that number. The State further argues that although it offered Defendant a more lenient pretrial plea offer, that offer was made in consideration of not making the victim have to relive the crimes committed against her on the witness stand at trial, which unfortunately still occurred. Furthermore, the State asserts that in light of the aggravating factors cited by the trial court in its sentencing and its clear reasoning for the sentence, the same should not be disturbed.

Defendant's excessive sentence claim was preserved by his counsel's objection to the sentences imposed as well as a written Motion to Reconsider Sentence, which was denied by the trial court without a hearing. In *State v. Morain*, 08-1546, pp. 2-4 (La.App. 3 Cir. 6/3/09), 11 So.3d 733, 735-36 (alteration in

13

original), *writ denied*, 09-1670 (La. 4/30/10), 34 So.3d 282, this court set forth the

following standard to be used in reviewing excessive sentence claims:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-0838 (La.2/1/02), 808 So.2d 331 (alteration in original).

In order to decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, we have held that:

> [A]n appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00), 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-0562 (La.5/30/03), 845 So.2d 1061.

14

In *State v. Whatley*, 06-316 (La.App. 3 Cir. 11/2/06), 943 So.2d 601, *writ denied*, 06-2826 (La.8/31/07), 962 So.2d 424, we discussed the factors that a reviewing court should consider in determining if a trial court abused its discretion in imposing a sentence. In *Whatley*, citing *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-0433 (La.6/25/99), 745 So.2d 1183, we annunciated three factors that a reviewing court should take into consideration in abuse of discretion cases: (1) the nature of the crime; (2) the nature and background of the offender; and (3) the sentence imposed for similar crimes by the same court and other courts.

At the sentencing hearing, both parties indicated they had reviewed the Presentence Investigation (PSI) report in this case and had no objections. The trial court considered a victim impact letter reflecting that the events that transpired from the time that C.F. was fourteen have caused much hurt and that "I still cry about it." The letter went on to state, "I pray that he never has the opportunity to touch another female again and that he couldn't hurt anyone else." The trial court also received letters written in support of Defendant. Defendant made a statement to the court reflecting that he did not wish to "belittle this situation" or "what the victim is accusing me of" but asks for "the mercy of the Court in this matter."

The trial court then pronounced the sentence and stated the following in reasons in support thereof:

> I have considered aggravating and mitigating factors as well as arguments of counsel, which have approached the issue of the aggravating and mitigating factors as well. But for my records, I have looked at the prior history, the record, the convictions, noting several prior convictions, although he pled on the same day and is being sentenced as a second felony offender.
>
> I'll also note that this was his stepdaughter. It was out of a position of trust. And I'll also note that there was a prior revocation on probation of Mr. Faciane. But I note that that was quite some time ago, over fifteen years ago.
>
> On the mitigating factors, I've looked at the victim's statement where she does not want the max, is what was in one of the statements. But I think there's some confusion. In one statement she says she doesn't want the max but the max is twenty. And then I think she said a sentence of twenty would be okay.

So I have taken that into account. I'll note for Mr. Isame there has been an extended period of time since his last arrest and/or conviction. That was back, at least a period of over fifteen years. I'll also note as a mitigating factor that he has bettered himself. He came out of a street life situation to become a working person in the community and a productive member of society. Albeit he had an eighth grade education, he's overcome that.

I also considered the letters from some of the constituents.

There is a claim for restitution in regards to the victim. However, I don't find that the claim for restitution is at this point a claim that I can recompense.

. . . .

Okay. I think an appropriate sentence in this matter would be, considering all the aggravating and mitigating factors, on each count fifteen years hard labor to run concurrent. No fine. I'll waive the fine on this one.

Considering the above, we find that the record contains a factual basis that supports the sentences imposed. According to the PSI and the trial court's reasoning, Defendant is a second felony offender. In 1994, Defendant was arrested for simple robbery and second degree battery, but pled guilty to the amended charge of theft under $100.00. Defendant pled guilty to aggravated assault in 1995, and was sentenced to six months in parish jail, suspended, and three years of supervised probation. Defendant was also convicted of possession of a schedule II narcotic and sentenced in 1995, to three years hard labor, suspended, and three years of supervised probation. Defendant's probation was revoked in 1999.[5] The PSI supports the trial court's finding that although Defendant had a prior criminal history, he had no such record for almost twenty years until the current charges were filed. The sentence imposed was significantly less than the total maximum exposure. Further, if the trial court had ordered Defendant's sentences to run consecutively,

---

[5] The PSI further indicates Defendant was arrested on numerous other charges, some of which did not result in formal charges and some resulted in pleas to misdemeanor offenses.

16

the term of imprisonment would have totaled seventy-five years. Thus, Defendant received a substantial benefit from the trial court's imposition of concurrent sentences as there is jurisprudence supporting the imposition of consecutive sentences in similar cases. *See State v. H.B.*, 06-1436, p. 7 (La.App. 3 Cir. 4/4/07), 955 So.2d 255, 260, where this court stated, "Review of the jurisprudence shows that different victims, places, or dates mean different transactions and different schemes or plans." Additionally, in *State v. Roy*, 15-516, pp. 11-12 (La.App. 3 Cir. 11/4/15), 177 So.3d 1112, 1119,[6] this court has stated the following:

> In *State v. Thibodeaux*, 05-1187 (La.App. 3 Cir. 3/1/06), 924 So.2d 1205, *writ denied*, 06-700 (La.10/6/06), 938 So.2d 65, this court upheld three ten-year-consecutive sentences after Thibodeaux pled guilty to three counts of molestation of a juvenile. The offenses in *Thibodeaux* were not based on the same act or transaction and occurred over a five-year period for one victim and over a six-month period for the other two victims. *Id.* at 1214. This court further noted that Thibodeaux's acts reflected a propensity to prey on those unable to protect themselves, particularly the mentally handicapped victim. *Id.* The record contained evidence of threats of violence and actual acts of violence by Thibodeaux as well as evidence that Thibodeaux sought to purchase a firearm while out on bond. *Id.*
>
> In *State v. Mickens*, 31,737 (La.App. 2 Cir. 3/31/99), 731 So.2d 463, *writ denied*, 99-1078 (La.9/24/99), 747 So.2d 1118, the second circuit upheld consecutive sentences for one count of molestation of a juvenile and one count of indecent behavior with a juvenile (both offenses committed against the same victim). Mickens was sentenced to ten years for molestation of a juvenile and seven years for indecent behavior with a juvenile. In particular, the second circuit noted that Mickens was in a common-law relationship with the victim's mother and violated his paternal role in the commission of the crimes. *Id.* at 472. Additionally, the second circuit noted that consecutive sentences are not uncommon in cases involving acts of molestation over an extended period of time by persons in the same household as the victim. *Id.* at 473.
>
> Considering the above statutory and jurisprudential authority, we find the trial court did not abuse its discretion in imposing the minimum

---

[6]We note that there are cases which would also support the imposition of concurrent sentences in this case: *State v. Stamper*, 624 So.2d 1208 (La.1993); *State v. Urena*, 13-1286 (La.App. 3 Cir. 5/7/14), 161 So.3d 701, *writ denied*, 14-1603 (La. 4/10/15), 164 So.3d 829; *State v. Ste. Marie*, 97-168 (La.App. 3 Cir. 4/18/01), 801 So.2d 424; and *State v. Brown*, 627 So.2d 192 (La.App. 3 Cir. 1993), *writ denied*, 93-3101 (La. 3/18/94), 634 So.2d 850.

17

sentences, albeit consecutively. Defendant's assignment of error lacks merit.

Finally, we note the supreme court's repeated admonition "that sentence review under the Louisiana constitution does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is more appropriate in a given case." *State v. Savoy*, 11-1174, p. 5 (La. 7/2/12), 93 So.3d 1279, 1283 (citing *State v. Walker*, 00-3200 (La. 10/12/01), 799 So.2d 461; *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996); and *State v. Humphrey*, 445 So.2d 1155 (La.1984)). Accordingly, we find that Defendant's sentences are not excessive, and this assignment of error lacks merit.

## DECREE

For the reasons assigned, Defendant's convictions and sentences are affirmed.

**AFFIRMED.**

18